[Cite as *Yurkowski v. Univ. of Cincinnati*, 2017-Ohio-7681.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Sharon Yurkowski et al., | : | |
| Plaintiffs-Appellants, | : | |
| | : | No. 16AP-718 |
| v. | : | (Ct. of Cl. No. 2007-04311) |
| University of Cincinnati, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on September 19, 2017

**On brief:** *Allen Law Firm, LLC,* and *Mitchell W. Allen,* for appellants.

**On brief:** *Michael DeWine,* Attorney General, and *Anne Berry Strait,* for appellee. **Argued:** *Anne Berry Strait.*

APPEAL from the Court of Claims of Ohio

SADLER, J.

{¶ 1} Plaintiffs-appellants, Sharon Yurkowski, individually and as administratrix of the estate of Peter J. Yurkowski, in addition to Daniel P. Yurkowski and Cara F. Yurkowski, children of Peter and Sharon Yurkowski, appeal the September 12, 2016 decision of the Court of Claims of Ohio in favor of defendant-appellee, University of Cincinnati, on appellants' claims for medical malpractice, wrongful death, and loss of consortium. For the following reasons, we affirm the decision of the Court of Claims.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   This is the third appeal addressed by this court.  In *Yurkowski v. Univ. of Cincinnati*, 10th Dist. No. 11AP-974, 2013-Ohio-242 ("*Yurkowski I*"), we discussed the factual and initial procedural history as follows:

> Peter struggled with mental health issues in his youth, culminating in a suicide attempt at age 18.  He recovered from that episode and married Sharon in 1985. The couple subsequently had two children, Daniel and Cara. Peter received a doctorate in pharmacy and, in 1992, began working as a clinical pharmacist at University Hospital ("UH") in Cincinnati.  In addition to his clinical duties at the hospital, Peter traveled extensively throughout the country lecturing on pharmacology-related topics.  He also participated in various community activities.
>
> Peter's mental health issues resurfaced in September 2000, when he became extremely anxious and began to suffer from psychosomatic illnesses that prevented him from traveling. Peter was admitted to the UH emergency room with symptoms of severe anxiety and depression.  Because he did not want to be treated at the same hospital at which he was employed, he was subsequently transferred to Christ Hospital for inpatient treatment.  He was released a few days later, but was again treated at Christ Hospital in December 2000.
>
> In January 2001, Peter had another psychiatric episode.  Due to a shortage of beds at Christ Hospital, he was admitted to UH for [i]npatient treatment with Dr. James Curell.  Dr. Curell, an associate professor of clinical psychiatry at the university and an attending psychiatrist on the inpatient adult psychiatry unit at UH, knew Peter professionally and was aware that he had been diagnosed at Christ Hospital with major depression and panic disorder.  Dr. Curell adjusted the medications  Peter had been prescribed at Christ Hospital and urged him to curtail his lecturing and community activities in order to relieve stress. Peter responded well to the adjustments, and thereafter saw Dr. Curell only on an outpatient basis for the next two and one-half years.  Early in this period, Dr. Curell diagnosed Peter with bipolar 2 disorder; however, he subsequently abandoned that diagnosis and confirmed that Peter suffered from major depression and panic disorder.

In June 2004, Peter began a series of inpatient hospitalizations and outpatient treatment due to his worsening psychiatric state and multiple suicide attempts. In total, Peter was admitted to UH for inpatient psychiatric treatment ten times between June 2004 and February 2005. Medical records from each admission include detailed evaluations, diagnoses, progress notes, treatment plans, and discharge summaries from Dr. Curell and his psychiatric treatment team. Peter's treatment regimen included a combination of various mood-stabilizing, anti-anxiety, and anti-depressant medications, group and individual psychotherapy sessions, and electroconvulsive therapy.

In early February 2005, Dr. Curell sought a second opinion regarding Peter's treatment from psychiatrist Dr. Paul Keck, an expert in bipolar disorders and related psycho-pharmacology. After meeting with Peter and reviewing his medical and psychiatric history, Dr. Keck concurred with Dr. Curell's diagnosis of major depression and panic disorder and agreed that Peter did not suffer from bipolar 2 disorder. While Dr. Keck recommended adjustments to some of Peter's medications, including the addition of lithium, he did not recommend involuntary commitment to a mental health facility. Peter was subsequently discharged from UH.

One day after his discharge, Peter obtained a bottle of lithium from the UH pharmacy and ingested a significant quantity of the drug. Following medical treatment related to the overdose, Peter was transferred to the UH inpatient psychiatric unit. In mid-February 2005, Peter reported to Dr. Curell that his wife was planning to divorce him, and that he would not be permitted to return to the marital home upon his release from UH.

Peter remained in the inpatient psychiatric unit until March 22, 2005. During this period, Peter often expressed suicidal thoughts, and Dr. Curell contemplated transferring him to Summit Behavioral Health ("Summit"), a state psychiatric hospital, for long-term inpatient psychiatric treatment. However, in late February 2005, Peter began to improve, and Dr. Curell authorized him to leave UH for one day in order to secure a place to live upon his release. Upon his return to UH, Peter reported that he had located an apartment.

On March 1, 2005, Peter was served with divorce papers, and by March 4, 2005, had "decompensated" to the point where Dr. Curell believed Peter to be "acutely dangerous" to himself. (Tr. 155.) Dr. Curell ordered that Peter be placed in restraints and adjusted his medication in the hope of preventing another psychiatric episode. At this point, Dr. Curell was convinced Peter should be transferred to Summit; his progress notes in early-to-mid March indicate that transfer was imminent. However, by March 18, 2005, Peter exhibited significant improvement. According to Dr. Curell, Peter denied suicidal ideation, completed paperwork related to his divorce, discussed returning to work, and requested that he be discharged to his apartment rather than to Summit. At this point, Dr. Curell, although "still suspicious" and "worried because of [Peter's] up-and-down pattern," concluded that Peter would not benefit from long-term inpatient treatment at Summit. (Tr. 161.) Indeed, Dr. Curell believed that involuntary commitment would be so devastating to Peter's self-esteem that he would never recover.

Dr. Curell candidly discussed with Peter his reservations about discharging him from inpatient treatment. He ultimately concluded that Peter's best chance at recovery was to return to employment and begin living independently. Dr. Curell discharged Peter on March 22, 2005, with the proviso that Peter contact him immediately upon experiencing anxiety or suicidal ideation. Dr. Curell's progress notes from that day indicate that Peter was engaged with the staff, had no anxiety issues or suicidal ideation, and was planning to return to work the next week.

Peter attended outpatient treatment sessions with Dr. Curell on March 25, April 4 and 13, 2005. Dr. Curell's progress notes from those sessions indicate that, although Peter was sad about his impending divorce and remained "at risk," he had no depressive episodes or acute suicidal thoughts, had a bright and hopeful affect, had returned to work and moved into his apartment, and was taking his medications as prescribed. (Tr. 179.)

Sharon and the children remained in close contact with Peter following his discharge. According to Sharon, Peter was sad about living apart from the family, but was not anxious or agitated and did not exhibit any suicidal behavior. On April 17, 2005, Sharon and Peter celebrated their daughter's birthday together and made plans to attend an event later in the week.

> The next day, Peter committed suicide by ingesting a lethal overdose of olanzapine, a prescription medication, and diphenhydramine, an over-the-counter antihistamine.
>
> Following Peter's death, appellants filed an action in the Warren County Court of Common Pleas against several defendants, including Dr. Curell. Dr. Curell asserted he was entitled to personal immunity pursuant to R.C. 9.86 and 2743.02. Consequently, appellants filed an action in the Court of Claims against Dr. Curell, University Psychiatric Services, University Hospital, Inc., The Health Alliance of Greater Cincinnati, and University of Cincinnati Physicians, Inc. Appellants subsequently filed an amended complaint for medical malpractice, wrongful death, and loss of consortium, naming only appellee as defendant. The Court of Claims matter was stayed pending an immunity determination.

*Id.* at ¶ 2-13.

{¶ 3} An evidentiary hearing was held on the issue of immunity in October 2007. The Court of Claims determined that "based upon the totality of the evidence presented, the court finds that Dr. [James H.] Curell acted within the scope of his employment with [appellee] at all times relevant hereto." (Oct. 28, 2008 Immunity Decision at 6.) Thus, by decision dated October 2008, the Court of Claims ultimately found that Dr. Curell was entitled to statutory immunity. The judgment entry states that "[p]ursuant to Civ.R. 54(B), this court makes the express determination that there is no just cause for delay." (Oct. 28, 2008 Immunity Jgmt. Entry at 1.) Appellants did not appeal that decision.

{¶ 4} Thereafter, the common pleas court action was dismissed, and the stay was vacated in the Court of Claims. The Court of Claims bifurcated the issues of liability and damages and held a liability trial in January and April 2011. On October 6, 2011, the Court of Claims issued a decision, finding in favor of appellee. The Court of Claims came to its decision by applying the "professional judgment rule" to appellants' claim that Dr. Curell should not have discharged Peter from the psychiatric unit at University Hospital ("UH") on March 22, 2005, and determining that appellants failed to prove any failure of care proximately caused his suicide. (Oct. 6, 2011 Decision at 4.)

{¶ 5} Appellants appealed, and in *Yurkowski I*, we determined that there was competent, credible evidence which, if believed, would support the Court of Claims'

finding that Dr. Curell did not breach the accepted standard of care in his treatment of Peter. However, we found that the Court of Claims should have applied the ordinary malpractice standard set forth in *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), to Dr. Curell's discharge decision, instead of the professional judgment rule, and remanded the matter to the Court of Claims for further proceedings on that matter.

{¶ 6} As stated in *Yurkowski v. Univ. of Cincinnati*, 10th Dist. No. 13AP-1049, 2015-Ohio-1511, ¶ 3 ("*Yurkowski II*"):

> On remand, the case was assigned to a different judge from the one who conducted the trial and entered the judgment that we reviewed in *Yurkowski I*. On June 3, 2013, the trial court filed an entry stating that "the sole issue to be determined by the court on remand is 'whether Dr. Curell's decision to release Peter from [University Hospital] on March 22, 2005 fell below the applicable standard of care,' " and requiring that the parties file a summary of the evidence regarding the issue on remand. (June 6, 2013 Entry, 8, quoting *Yurkowski I* at ¶ 31.) After reviewing the parties' arguments, the trial court, on August 26, 2013, determined that it was unnecessary to hold a new trial or evidentiary hearing to comply with this court's decision. On November 15, 2013, the trial court issued a decision and judgment entry in favor of appellee, finding that appellants failed to prove by a preponderance of the evidence that appellee's actions fell below the standard of care and failed to prove that any alleged failure was the proximate cause of Peter's death.

{¶ 7} Appellants again appealed, asserting that it was against the manifest weight of the evidence for the Court of Claims to find that Dr. Curell did not breach the standard of care in his treatment of Peter or his decision to discharge Peter. In *Yurkowski II*, regarding Dr. Curell's treatment of Peter, we found that the issue was outside the scope of the Court of Claims' review on remand and that considering *Yurkowski I* resolved that matter, the law of the case doctrine precluded our review of such issue. Regarding the decision to discharge Peter without considering the merits of the argument, we found that the Court of Claims erred by entering judgment based on a review of the transcript of expert testimony from the prior trial where the parties did not stipulate to the same. Therefore, we remanded the matter for the Court of Claims to conduct an evidentiary hearing "limited only to the determination of the issue of our previous remand:

'[W]hether Dr. Curell's decision to release Peter from UH on March 22, 2005 fell below the applicable standard of care.' " *Yurkowski II* at ¶ 18, quoting *Yurkowski I* at ¶ 31.

{¶ 8}   In accordance with our directive, the Court of Claims held an evidentiary hearing on May 11-12, 2016.  At the hearing, appellants filed a motion for an immunity decision, motion to add defendants, and jury demand as to the additional defendants. The Court of Claims denied the motions because immunity had already been determined and due to the limited scope of remand.  Appellee then presented the testimony of Dr. Curell and Dr. Mark A. Schechter, and appellants presented the testimony of Dr. Robert P. Granacher and Sharon Yurkowski.

{¶ 9}   Dr. Curell recounted Peter's medical history and treatments and his opinion of Peter's condition.  Dr. Curell believed Peter had major depression with severe anxiety and panic attacks and described Peter's tendency to become suicidal in the midst of suffering from a panic attack.  After being in inpatient care for over one month, Dr. Curell changed Peter's medication on March 14; the change in medication helped to stabilize Peter, and he improved.  Dr. Curell reviewed progress notes documenting those improvements, which included no further panic attacks, more focus on dealing with work and his divorce, and denials of suicidality.  Although another physician noted that Peter downplayed the severity of his symptoms to an alarming degree, Dr. Curell believed Peter did feel okay once his panic attack resolved, so at the time of discharge he was legitimately not panicking or suicidal.  Dr. Curell noted that he did not take Peter's statements about getting better at face value, was skeptical given his history, and deliberately did not release him right away after improvement began.  Dr. Curell testified that "[e]very moment I was with [Peter] I was assessing his risk for suicide."  (Tr. Vol. 7 at 1420.)  Dr. Curell discussed that Peter had turned passivity into action, seemed more bright and hopeful, and had a plan.  Getting back to work was important to Peter, and, in consultation with Peter's boss, the stress of his job was reduced considerably, and there was hope that an opening for a position in his preferred line of work would arise that summer.

{¶ 10} Dr. Curell acknowledged that discharging Peter to the apartment was risky and thought it was fairly predictable that Peter would have a panic attack at some point in the future.  Dr. Curell agreed he had told Peter repeatedly that he was putting his own

neck on the line by discharging him. As a part of his decision to discharge Peter, Dr. Curell considered the fact that Peter would be released to an apartment alone and noted that although Peter would not have the support of family, he would correspondingly not have the stress of family, which had contributed to prior panic attacks. The key issue to Dr. Curell was whether he could trust Peter to contact him or someone else to protect himself. Ultimately, Dr. Curell believed, based on treating him for over four years, that Peter would do so. He noted that Peter could have committed suicide while out on a pass from inpatient care but, instead, got an apartment, took care of business, and came back to the hospital. He also noted that Peter was in terrible shape in 2001 but, on the right medication and with support, he did stabilize for a few years.

{¶ 11} In Dr. Curell's opinion, at the point of discharge, Peter had stabilized enough where he no longer fit the criteria for a transfer to Summit Behavioral Health ("Summit"). Dr. Curell testified that he would have transferred Peter to Summit if he believed Peter was at imminent risk but thought sending him to Summit presented its own risk to Peter's health and could have even made him worse. For example, transferring Peter to Summit could have affected Peter's chances of recovering his marriage and his job prospects, which were very important to Peter. For Peter's severe "type A," obsessive compulsive personality with severe anxiety, going to a mental hospital would be a failure that—combined with losing his job and income, divorce from his wife, and estrangement from his children—would leave him "a broken man." (Tr. Vol. 7 at 1434.) In Dr. Curell's judgment, Peter was not at imminent risk of suicide on March 22, 2005 and Peter's best opportunity to recover was to try to stay working, reestablish himself in the community, stay in touch with his wife, have a relationship with his children, and hopefully build back his life. Although in retrospect Dr. Curell questioned his decision to discharge Peter from the hospital in light of Peter's suicide several weeks later, Dr. Curell did not believe his decision fell below the standard of care based on the circumstances and options at the time of discharge.

{¶ 12} Dr. Schechter teaches suicide risk assessment at Harvard Medical School and is the chair of the Department of Psychiatry at a medical center who, in his daily practice, treats patients in inpatient settings and makes decisions about discharging patients from inpatient care. Dr. Schechter testified that in determining whether to

discharge a patient from inpatient care, the physician must weigh the risk factors against the mitigating or beneficial factors, including comparing the risks and benefits of alternatives. What is important to that patient—what gives his life meaning and something to live for—is a part of that decision, and Dr. Schechter noted that taking away some of the things a patient lives for ultimately may make the risk of suicide worse.

{¶ 13} According to Dr. Schechter, Peter would always carry a significantly higher risk of suicide than that of the general population but that was not a reason to keep him as an inpatient indefinitely. Dr. Schechter explained that inpatient care corresponds to imminent risk and is appropriate to treat a patient's acute condition to the point they no longer require 24/7 monitoring and can begin to take some responsibility for themselves. He noted that most work with chronically suicidal patients occurs in an outpatient setting. Addressing Peter's case, Dr. Schechter believed Dr. Curell was aware of the issues of risk versus the issues of the importance of working to Peter and his desire to get his life back, saw and documented Peter's clinical improvement, and kept him in the hospital beyond the first day he felt better to ensure stability. He testified that the lack of a written risk assessment is not equivalent to failing to conduct that risk assessment and believed that based on the records, Dr. Curell was assessing Peter each time he saw him. Regardless, the failure to document a risk assessment had no casual connection to Peter committing suicide. In Dr. Schechter's opinion, on March 22, 2005, Peter no longer met the criteria for inpatient hospitalization and outpatient treatment was an appropriate next step; likewise, Dr. Curell's determination that Peter was no longer at imminent risk of suicide was a "very reasonable assessment." (Tr. Vol. 8 at 1635.) Considering Peter's case, Dr. Schechter opined that Dr. Curell's decision to discharge Peter met the standard of care.

{¶ 14} Dr. Granacher is a former chair of the administrative board, quality systems, and credentialing systems of a hospital who also worked in the hospital's inpatient unit until the unit's closure in 2002 and who currently practices part-time, predominantly in a mental health clinic. Dr. Granacher testified that based on his experience and education, Dr. Curell's decision to discharge Peter on March 22, 2005 fell below the standard of care. In his opinion, no record evidence shows a proper risk assessment was conducted. A proper risk assessment to Dr. Granacher involves building a database of information on the patient and comparing short-term and long-term risk

factors against "protective factors." (Tr. Vol. 8 at 1499.) He noted that a highly suicidal patient cannot be relied on to truthfully report their own risk and, therefore, the database must include information from family, friends, employers, etc.

{¶ 15} According to Dr. Granacher, a proper risk assessment would have showed that Peter was not competent to manage his own health and should not have been discharged into an isolated apartment. He cites Peter's marriage, employment, and status as a highly educated professional as protective factors. However, he believed those protective factors were drastically outweighed by risk factors such as his access to drugs as a pharmacist, his history of suicide attempts, the increasing frequency and lethality of suicide attempts, his diagnosis of panic disorder and Dr. Granacher's diagnosis of bipolar disorder, the impending divorce, incompetence to manage his own health and safety, and the fact that he would be discharged alone with instructions to call if he needs help and with enough mediation to kill himself.

{¶ 16} The Court of Claims found the testimony of Dr. Curell and Dr. Schechter to be more persuasive than Dr. Granacher and determined that appellants failed to prove by a preponderance of the evidence that Dr. Curell's release of Peter on March 22, 2005 fell below the standard of care. In addition, the Court of Claims found that, even assuming Dr. Curell breached his duty, appellants failed to establish proximate cause by a preponderance of the evidence. As a result, the Court of Claims rendered judgment in favor of appellees. Appellants filed a timely appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 17} Appellants present three assignments of error:

> [1.] THE TRIAL COURT ERRED IN FAILING TO REVISE ITS PRIOR IMMUNITY DECISION OR HAVE A NEW HEARING ON THE IMMUNITY ISSUE IN LIGHT OF THE REMAND.
>
> [2.] THE TRIAL COURT'S FINDING THAT DR. CURELL'S DECISION TO DISCHARGE PETER YURKOWSKI ON MARCH 22, 2005 DID NOT FALL BELOW THE STANDARD OF CARE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [3.] THE TRIAL COURT ERRED IN DECIDING THAT PLAINTIFFS FAILED TO PROVE PROXIMATE CAUSE.

## III. DISCUSSION

### A. First Assignment of Error

{¶ 18} Under the first assignment of error, appellants assert that the Court of Claims erred in failing to revise its prior immunity decision or have a new hearing on immunity. Due to the procedural history of this case, appellants are precluded from raising issues of immunity in this appeal.

{¶ 19} Both failing to file an appeal and failing to present arguments in previous appeals may invoke the doctrines of res judicata and waiver when an appellant attempts to raise new arguments in subsequent appeals. *State v. Gray*, 10th Dist. No. 06AP-10, 2006-Ohio-4595, ¶ 14 (internal citations omitted) ("Where an argument could have been raised on an initial appeal, res judicata dictates that it is inappropriate to consider that same argument on a second appeal following remand."); *State v. Cunningham*, 10th Dist. No. 14AP-251, 2014-Ohio-3702, ¶ 12 (res judicata barred arguments where appellant failed to appeal from previous relevant judgment entries and failed to present the arguments in previous appeals); *Cugini & Capoccia Builders, Inc. v. Ciminello's, Inc.*, 10th Dist. No. 06AP-210, 2006-Ohio-5787, ¶ 36 (noting that an appellant waives an issue by not raising it in his initial appeal).

{¶ 20} Here, in their March 2008 brief on immunity, appellants raised Dr. Curell's decision to discharge Peter as an issue. They emphasized medical records from the discharge date, March 22, 2005, in an attempt to show Dr. Curell was acting outside the scope of his employment with appellee at the time of the decision to discharge Peter. The Court of Claims acknowledged this argument and ultimately determined that "Dr. Curell acted within the scope of his employment with [appellee] at all times relevant hereto." (Immunity Decision at 6.) Appellants did not attempt to appeal from the immunity decision and did not assert immunity as error in their two subsequent appeals to this court. During the May 11-12 remand for a rehearing on the specific issue of whether the decision to discharge breached the standard of care, appellants moved to revisit the immunity decision. The Court of Claims denied the motion because that issue had been previously determined and due to the limited scope of remand.

{¶ 21} Appellants now assert that our prior decisions required the Court of Claims to revise its decision on immunity or at least hold a hearing on the issue. According to

appellants, the Court of Claims based its immunity decision on a 298-day period of treatment, but the prior decisions of this court, which narrowed in on Dr. Curell's decision to discharge Peter, essentially changed the time frame from which to review immunity. Appellants propose that after our decisions, "the Trial Court was to consider essentially a 28 day period of time in which 27 days were covered by out-patient treatment unrelated to any in-patient treatment and with only a few hours of 1 day, the day Dr. Curell made the discharge decision, actually being in-patient." (Appellants' Brief at 7.)

{¶ 22} Because appellants did not challenge the immunity decision in any prior appeal, they are barred from now asserting immunity as a basis for appeal under the doctrines of res judicata and waiver. Appellants' specific argument related to the time frame from which to form the immunity decision is likewise precluded from review. In our view, appellants present our prior decisions as a basis to argue an issue which they could have, but did not, previously challenge on appeal. The Court of Claims' immunity decision considered Dr. Curell's decision to discharge Peter and appellants' related arguments. (Immunity Decision at 6.) Appellants were in a position to argue that the decision to discharge Peter demanded a more narrow time frame for purposes of immunity, but they did not raise that issue in an appeal.

{¶ 23} Notwithstanding waiver or res judicata, appellants' argument is not well-taken. Nothing in our two previous decisions set a "shorter time-frame" for purposes of the immunity or even confined the analysis of breach of the standard of care to a specific period. (Appellants' Brief at 13.) Moreover, generally, "when an appellate court remands a case for a limited purpose, 'the trial court [is] obliged to accept all issues previously adjudicated as finally settled.' " *Cugini* at ¶ 32, quoting *Blackwell v. Internatl. Union, U.A.W.*, 21 Ohio App.3d 110, 112 (8th Dist.1984). Appellants provide no authority requiring a trial court to revisit a prior decision on immunity, unchallenged in previous appeals, in a hearing on remand expressly limited to another specific purpose. *See* App.R. 16(A)(7).

{¶ 24} Accordingly, appellants' first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 25} Under the second assignment of error, appellants contend that the Court of Claims' finding that Dr. Curell's decision to discharge Peter on March 22, 2005 did not fall

below the standard of care is against the manifest weight of the evidence. For the following reasons, we disagree.

{¶ 26} In *Nelson v. Univ. of Cincinnati*, 10th Dist. No. 16AP-224, 2017-Ohio-514, we recently set out the standard of review to be applied in a civil case in assessing whether a trial court's judgment is against the weight of evidence as follows:

> " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, 972 N.E.2d 517, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).
>
> " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Rosenshine v. Med. College Hosps.*, 2012-Ohio-2864, ¶ 9, 974 N.E.2d 692, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978). "Under the civil [manifest-weight-of-the-evidence] standard, examining the evidence underlying the trial judge's decision is a prerequisite to determining whether the trial court's judgment is supported by some competent, credible evidence." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 40, 865 N.E.2d 1264. *See also Eastley* at ¶ 15 ("The phrase 'some competent, credible evidence' * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible."). Accordingly, a reviewing court must weigh the evidence presented in the trial court.
>
> However, in weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Id.* at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984) (noting that a reviewing court gives deference to the finder of fact because "the [finder of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony"). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that

> interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Eastley* at ¶ 21, quoting *Seasons Coal* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10, 998 N.E.2d 883, citing *Eastley* at ¶ 20.

*Id.* at ¶ 28-30. *Yurkowski I* at ¶ 41; *Tobin v. Univ. Hosp. E.*, 10th Dist. No. 15AP-153, 2015-Ohio-3903, ¶ 12-13, *appeal not accepted*, 145 Ohio St.3d 1411, 2016-Ohio-899. As we stated in *Yurkowski II* at ¶ 15, in a medical malpractice case, whether the defendant has employed the requisite care must be determined from the testimony of experts, and it is the duty of the trier of fact to weigh and resolve conflicting medical testimony from expert witnesses. "[A] determination of credibility is implicit within the analysis of whether a defendant has breached the standard of care in a medical malpractice case." *Id.*

{¶ 27} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances." *Bruni* at paragraph one of the syllabus. *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 20. A psychiatrist, as a medical specialist, is held to the standard of care "of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field." *Bruni* at paragraph two of the syllabus.

{¶ 28} In support of their assignment of error, appellants first point to Dr. Granacher's opinion that Dr. Curell did not conduct a proper suicide risk assessment, as evidenced by a lack of documentation of such a risk assessment and no other evidence that the assessment was performed. However, because this issue was previously decided, the law of the case doctrine applies. The law of the case doctrine provides that "the

decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." (Internal citations omitted.)   *Yurkowski II* at ¶ 6 (precluding review of appellants' reassertion of arguments regarding the Court of Claims' determination on Dr. Curell's psychopharmacology treatment plan under the law of the case doctrine).  In *Yurkowski I* at ¶ 42, 52, 58, we determined that Dr. Curell did not breach the applicable standard of care by failing to perform and document a suicide risk assessment prior to discharging Peter.  As such, pursuant to the law of the case doctrine, this issue is precluded from review. *Yurkowski II* at ¶ 9.

{¶ 29} Second, appellants argue that Dr. Curell breached his duty of care in failing to accurately weigh protective versus risk factors in making his decision to discharge Peter.  Appellants point to Peter's employment as a pharmacist, his history of suicide attempts showed increasing frequency and escalating lethality, the diagnosis of panic disorder and differential diagnosis of bipolar disorder, his impending divorce and discharge alone with instructions to call if he needed help and without sufficiently integrating his wife, Sharon, his incompetence to manage his own health, safety, and welfare as exhibited by his Global Assessment of Functioning score of 35, and Dr. Curell's decision to release Peter with enough medicine to kill himself.  Appellants add that Dr. Curell admits he knew the risk but released him anyway and admits that he might not have made the right decision.  Instead of releasing Peter, appellants contend that the prudent course of action would be to have sent him to a state mental hospital if discharging him to Sharon's home was not possible.  Appellants further believe that the Court of Claims ignored facts, mischaracterized Dr. Granacher's credentials, and did not properly determine whether the testimony was supported by the record, but instead simply accepted flat denials of the breach of the standard of care.

{¶ 30} In *Yurkowski I*, in determining that the Court of Claims' decision that Dr. Curell's treatment plan did not breach the standard of care, we specifically addressed several sub-issues in addition to the suicide risk assessment, including failing to provide an oversight plan for management of Peter's medications including prescribing lethal doses of medication, "misdiagnosing" Peter as not being bipolar, failing to maintain appropriate boundaries, failing to develop an appropriate psychopharmacology plan,

failing to sufficiently integrate Sharon, failing to coordinate with a therapist to assist with outpatient treatment, and failing to provide a proper psychopharmacology plan[1] and suicide risk prevention plan after his discharge including the decision to prescribe multiple doses of medicine and permitting Peter to return to work at the pharmacy from which he previously obtained a lethal quantity of drugs. *Yurkowski I* at ¶ 43-51.

{¶ 31} Therefore, to the extent that appellants reassert matters which fall within the scope of Dr. Curell's treatment of Peter, pursuant to the law of the case doctrine, those issues are precluded from review. *Yurkowski II* at ¶ 9. We will instead proceed to address these issues only as they relate to Dr. Curell's decision to discharge.

{¶ 32} To that issue, the parties agree that both experts stated that the standard of care for discharging a patient such as Peter is to conduct a suicide risk assessment and to weigh protective versus risk factors. Appellants agree that based on the scope of remand, resolution of this issue "essentially comes do[wn] to the testimony of the expert witnesses and admissions of [Dr. Curell]." (Appellants' Brief at 14.) Contrary to appellants' argument, we believe both experts explained the basis for their opinions extensively and both opinions were supported by competent and credible record evidence. Furthermore, we find no indication that the Court of Claims erred in its determination of credibility, which is within its core competence as trier of fact, or in its consideration and weighing of the evidence. *Stanley* at ¶ 50 (noting the trial court has no duty to comment on certain evidence). On thorough review of the record, we conclude that the Court of Claims' finding that Dr. Curell's decision to discharge Peter on March 22, 2005 did not fall below the standard of care is not against the manifest weight of the evidence.

{¶ 33} Accordingly, appellants' second assignment of error is overruled.

## C. Third Assignment of Error

{¶ 34} Under the third assignment of error, appellants assert that the Court of Claims erred in deciding that they failed to prove proximate cause. Specifically, appellants argue that contrary to the Court of Claims' decision, the testimony of Dr. Granacher established the proximate cause element of medical malpractice.

---

[1] In *Yurkowski II* at ¶ 9, we previously precluded review of appellants' reassertion of arguments regarding the Court of Claims' determination onm Dr. Curell's psychopharmacology treatment plan under the law of the case doctrine.

{¶ 35} In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. *Stanley* at ¶ 19, citing *Bruni* at 130. Thus, where the plaintiff fails to demonstrate that the defendant breached the requisite standard of care, the medical malpractice claim fails regardless of proximate cause. *Stanley* at ¶ 19, citing *Bruni* at 130; *Morgan v. Ohio State Univ. College of Dentistry*, 10th Dist. No. 13AP-287, 2014-Ohio-1846, ¶ 38, 40-47, 87 (finding where one element of professional negligence is established, the remaining assignments of error on other elements of professional negligence are moot); *Ernes v. N.E. Ohio Eye Surgeons, Inc.*, 11th Dist. No. 2005-P-0043, 2006-Ohio-1456, ¶ 18 (without a breach of the standard of care, it is elemental negligence law that the issue of proximate cause is moot).

{¶ 36} Because we have already decided that the Court of Claims' determination that Dr. Curell's decision to discharge Peter on March 22, 2005 did not fall below the standard of care was not against the manifest weight of the evidence, we find appellants' third assignment of error to be moot. *Morgan*; *Ernes*.

{¶ 37} Accordingly, appellants' third assignment of error is rendered moot.

## IV. CONCLUSION

{¶ 38} Having overruled appellants' first and second assignments of error and rendering appellants' third assignment of error moot, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

_____