[Cite as *Havenar v. Melaragno*, 2022-Ohio-389.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Linda P. Havenar, et al., | : | |
| Plaintiffs-Appellants, | : | No. 21AP-336 |
| | | (C.P.C. No. 18CV-2455) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Paul Melaragno, M.D. et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on February 10, 2022

**On brief**: *Butler, Cincione & DiCuccio,* and *N. Gerald DiCuccio*; *Katz, Pryor & DiCuccio, LLP*, and *Robert K. DiCuccio*, for appellants. **Argued**: *N. Gerald DiCuccio* and *Robert K. DiCuccio.*

**On brief**: *Poling Law*, *Brant E. Poling*, and *Sabrina S. Sellers*, for appellees.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} Plaintiff-appellants Linda and Tom Havenar appeal from the trial court's grant of summary judgment to defendant-appellees Paul Melaragno and Orthopedic One, Inc. (together, "Dr. Melaragno") on the Havenars' respective medical malpractice and loss of consortium claims. The trial court found that the record before it, when read in the light most favorable to the non-moving Havenars, could not support a conclusion that Dr. Melaragno's alleged negligence was a direct cause of injury to Ms. Havenar. Instructed by guiding precedent, we disagree and will reverse the grant.

{¶ 2}    The trial court's June 11, 2021 Decision and Entry aptly summarizes the outlines of the case.  "Linda began seeing Melaragno in May of 2016 for treatment because she was experiencing groin and hip pain on her right side.  During the 2016 appointment, Melaragno ordered and reviewed an x-ray of Linda's right hip and groin area * * *.  The Havenars allege that in reviewing that x-ray, Melaragno failed to identify a lesion that by 2017 was determined to be cancerous.  Instead of following up on the lesion, Melaragno recommended injections for Linda's pain."  Decision and Entry at 1 (citations to Linda Havenar deposition omitted).  Ms. Havenar received injections for her pain in August and December 2016, but "[i]n January of 2017, she began experiencing a similar, but worse, pain in her hip and groin.  She called Orthopedic to report this and was told to do nothing." *Id.* at 1-2 (citations omitted).  Ms. Havenar saw Dr. Melaragno again in March 2017, and an "MRI revealed a tumor in Linda's ilium.  Linda testified that Melaragno described the tumor as 'bigger than last year.' "  *Id.* at 2 (citations omitted).

{¶ 3}    Ms. Havenar "consulted with Dr. [Joel] Mayerson, who advised her that the lesion was cancerous" and reviewed with her two potential treatment options.  *Id.* at 2.  "The first was a leg sparing procedure [referred to as an internal hemipelvectomy].  The second was a hind quarter [including leg] amputation or [external] hemipelvectomy." *Id.* (citations omitted).  Given "the risks described to her by Dr. Mayerson related to the limb-sparing procedure, and that she would end up needing the external hemipelvectomy anyway[]," Ms. Havenar opted for and received the amputation.  *Id.* at 2-3 (citations omitted).  Dr. Mayerson performed that external hemipelvectomy on May 11, 2017.  *Id.* at 3 (citation omitted).

{¶ 4}    The Havenars sued Dr. Melaragno the next year, alleging that he was negligent in failing "to timely diagnose and treat [the] lesion * * *, which was subsequently diagnosed as malignant Sarcoma."  Mar. 21, 2018 Complaint at ¶ 7.  The (roughly ten-month) delay in identifying the tumor as an issue of concern, the Complaint alleges, caused "severe and permanent injury, disability and damages," "ultimately result[ed]" in the amputation, and gave rise to "suffering, disability and deformity, both physical and mental," as well as other injury.  *Id.* at ¶ 8.

{¶ 5}    Pursuant to Civil Rule 10, the Havenars filed with their Complaint an Affidavit of Merit from Dr. Scott Weiner, who attested among other matters that his medical

records review found that an Ohio State University Medical Center pelvic MRI from 2009 had "demonstrated a small bone cyst," and that other imaging of the area was conducted there in 2011, in 2013 (when a CT scan "demonstrated the previously noted cyst with no change in its size"), and in 2015 (when "the lesion in the right iliac was visualized and determined to be unchanged").  Affidavit of Merit at ¶ 2-5.  The "large radiolucent abnormality above the right acetabulum" on the May 12, 2016 x-ray that Dr. Melaragno obtained "indicated growth of the previously noted bone cyst."  *Id.* at ¶ 6.  The March 21, 2017 MRI showed that the "lesion had grown significantly" over the more than ten months since the 2016 x-ray.  *Id.* at ¶ 7.  Dr. Melaragno's failure "to discover and evaluate the lesion" shown by the 2016 x-ray "fell below the appropriate standards of care for an orthopedic surgeon," Dr. Weiner opined.  *Id.* at ¶ 9.  That failure "foreclosed any option for alternate means of treatment including limb-sparing surgery" and "contributed to the complexity of the eventual surgery performed," the Affidavit of Merit concluded.  *Id.* at ¶ 9-10.

{¶ 6}  Discovery ensued.  In due course, and citing discovery delays, the Havenars moved to push back the trial date and extend the case schedule.  Feb. 20, 2020 Plaintiffs' Motion to Continue.  The trial court granted their motion and set a trial date of February 1, 2021.  Mar. 13, 2020 Agreed Entry.  Dr. Melaragno filed his summary judgment motion on November 19, 2020, and that same day filed a motion for leave to do so (explaining that the Havenars had "only recently [taken] the deposition of Defendant's expert witness, Dr. Paul Getty, on October 23, 2020").  Nov. 19, 2020 Motion for Leave.  The Havenars opposed the motion for leave as out of time without a showing of excusable neglect pursuant to Civil Rule 6(B)(2) and as threatening undue delay.  Dec. 3, 2020 Plaintiffs' Memo Contra at 1.  Alternatively, they asked for an extension of time in which to respond to the summary judgment motion.  *Id.*  The trial court granted Dr. Melaragno leave to file his summary judgment motion and granted the Havenars a further 60 days in which to respond to the motion; the trial court also noted that Covid-related scheduling constraints would necessitate continuing the trial date in any event.  Dec. 16, 2020 Entry at 4 (detailing that court was precluded from holding in-person hearings during the week of February 1, 2020, and that "a large accumulation of criminal trials with in-custody defendants" occupied the calendar until May 2021).  Subsequently, the trial court granted the Havenars a further two-

week briefing extension requested in light of Covid concerns and "the recent discovery of Plaintiff Linda Havenar's probable development of metastatic disease." Jan. 8, 2021 Entry.

{¶ 7} Dr. Melaragno's summary judgment motion was premised on the notion that any negligence in delaying discovery of the lesion from May of 2016 to March of 2017 did not matter: "she would have been presented with the same options for treatment" in either event. Nov. 19, 2020 Motion for Summary Judgment at 2 (emphasis omitted). "Ms. Havenar was presented with her options and chose to undergo an external hemipelvectomy," the motion urged, *id.* at 11; "Dr. Mayerson stated explicitly that he would have offered the same treatment to Ms. Havenar in 2016 as he did in 2017." *Id.* at 12.

{¶ 8} In response, the Havenars cited to Dr. Weiner's opinion in his Affidavit of Merit that the delay had effectively denied any option of limb-sparing surgery. Mar. 2, 2021 Memo Contra at 6-7. They quoted extensively from Dr. Mayerson's opinions that there had been a " 'significant increase' " in the size of the tumor over the ten month 2016-2017 period, and that the tumor had " 'migrated * * * towards the SI [sacroiliac] joint' "—a joint critical to the choice between limb-sparing and limb-amputating surgery because the former requires " 'enough of a platform of bone that's going to handle the weight and the ambulation -- or the weight from the bone meeting  -- the femur bone meeting the pelvis.' " *Id.* at 8-9. Dr. Mayerson testified that he would have been " 'comfortable' " offering the limb-sparing internal hemipelvectomy in 2016, they noted, *id.* at 9, whereas in 2017 he had told Ms. Havenar that he deemed it at that stage a " 'high-risk procedure' " (for still leaving a need to amputate the leg) that " 'would likely need vascularized bone to heal the remaining portion of the SI joint, which would be destabilized,' " *id.* at 10. Finally, the Havenars cited to an affidavit from Linda Havenar reporting that in January of 2021, she was diagnosed with metastatic disease that has spread to her right lung and clavicle and that she attributes to the earlier sarcoma. *Id.* at 11 and Affidavit of Linda Havenar (filed Mar. 2, 2021) at ¶ 10.

{¶ 9} The trial court properly understood that "Defendants base their motion for summary judgment solely on their argument that the Havenars have provided no evidence of proximate cause"—no evidence, that is, of any direct causal connection between the asserted medical negligence of Dr. Melaragno and injury to Ms. Havenar. Decision and Entry at 3-4, citing *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 19.

**{¶ 10}** In determining whether the Havenars had pointed to any such evidence, the trial court began its analysis by ruling out Dr. Weiner's Affidavit of Merit as an evidentiary source. Civil Rule 10(D)(2)(d) and guidance from this court do not allow it, the trial court explained, and no potential exception to that rule exists here because the affidavit simply meets the sufficiency standards of Civil Rule 10(D)(2)(a) "and does not explain how or why [the alleged negligence] foreclosed a limb-sparing procedure." Decision and Entry at 5. Moreover, the trial court observed, Dr. Weiner had had the opportunity to testify more fully through his deposition and had retreated from the position cited from his Affidavit of Merit. *Id.* at 5-6.

**{¶ 11}** Ms. Havenar's affidavit did not count either, the trial court ruled. "Hearsay statements are not admissible[;] * * * * [t]he process and cause of the spread of cancer * * * would require expert testimony"; and no evidence was offered to show that the alleged negligence of Dr. Melaragno caused this spread of disease. *Id.* at 7-8.

**{¶ 12}** The trial court devoted one paragraph to assessing Dr. Mayerson's testimony. It did not mention Dr. Mayerson's statement that the tumor had undergone a "significant increase" in size between 2016 and 2017 (nor did it recur to Ms. Havenar's testimony that Dr. Melaragno had described the tumor as "bigger than last year"). But the trial court did recite that Dr. Mayerson "testified that after comparing images of Linda's lesion in 2016 and 2017, he was able to determine that it moved closer to the SI joint, the integrity of which is critical to the ability to perform in internal hemipelvectomy." *Id.* at 6. "Despite this, he testified that he offered Linda the choice between an internal and external hemipelvectonmy [sic] in 2017, albeit with the caveat that an internal hemipelvectonmy [sic] would be a high-risk procedure and could be unsuccessful," the trial court continued. *Id.* Then, the trial court added: "Even so, he was unable to offer an opinion as to when an internal hemipelvectonmy [sic] was no longer realistic." *Id.* The trial court concluded that "[a] review of the record * * * has not revealed any evidence that indicates that as a result of Melaragno's failure to diagnose the lesion in 2016, Linda's chance of success with an internal hemipelvectonmy [sic] was worse in 2017 than at the time of Melaragno's alleged failure to diagnose and monitor it in 2016." *Id.* at 6-7; *see also id.* at 8 ("no evidence offered that Defendants' deviation from the * * * standard of care * * * proximately caused harm to Linda by lowering her chances for survival or successful treatment"). The trial court did

not discuss what appropriate inferences, if any, were to be drawn from Dr. Mayerson's testimony that he would have been "comfortable" offering the limb-sparing internal hemipelvectomy in 2016 (at the time before its growth toward the SI joint).

{¶ 13} Finding "no issue of genuine material fact on the element of proximate cause," and no other "issue of fact," the trial court granted summary judgment against the Havenars' claims. *Id.* at 8-9 (explaining, too, that Mr. Havenar's loss of consortium claim is purely "derivative" of his wife's malpractice claim).

{¶ 14} The Havenars present two assignments of error:

> I. The trial court erred to the prejudice of Plaintiffs in granting Defendants' motion for leave to file summary judgment as Defendants failed to make any showing of excusable neglect.
>
> II. The trial court erred to the prejudice of Plaintiffs in granting Defendants' motion for summary judgment as Plaintiffs presented a genuine issue of material fact regarding the element of proximate cause.

Appellants' Brief at 2 (capitalizations adjusted).

{¶ 15} We do not parse here whether under the circumstances of this case, references to the parties' discovery delays and the Havenars' then-recent deposition of Dr. Melaragno's expert constitute implicit grounds for excusable neglect in not filing the summary judgment motion earlier. Rather, we start, and end, with the independently dispositive second assignment of error. We review a grant of summary judgment "de novo, governed by the standard set forth in Civ.R. 56." *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8. When assessing the matter afresh, "the court of appeals independently reviews the record and affords no deference to the trial court's decision." *Premiere Radio Networks, Inc. v. Sandblast, L.P.,* 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6, citing *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9. "Thus, we conduct an independent review of the record and stand in the shoes of the trial court." *Nalluri v. Jones*, 10th Dist. No. 19AP-779, 2020-Ohio-4280, ¶ 14 (citations omitted).

{¶ 16} Under Civil Rule 56, "summary judgment is appropriate when an examination of all relevant materials filed in the action reveals that '[t]here is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 12, quoting Civ.R. 56.

When the moving party points to evidence showing that the non-moving party has no evidence to support a necessary element of its claims, the non-moving party then has a reciprocal burden to point to specific facts showing there is a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280 (1996). In reviewing the evidentiary record to determine whether a party has met its respective summary judgment burden, courts must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *See, e.g., Hartman v. Ohio Dept. of Transp.*, 10th Dist. No. 16AP-222, 2016-Ohio-5208, ¶ 23.

{¶ 17} Here, Dr. Melaragno, as the moving party, sought summary judgment "solely [on the basis that] the Havenars * * * provided no evidence of proximate cause." Decision and Entry at 3-4. Proximate cause of injury is a necessary element that a plaintiff must prove to prevail on a medical malpractice claim. *See, e.g., Loudin v. Radiology & Imaging Servs.*, 128 Ohio St.3d 555, 2011-Ohio-1817, ¶ 13 ("As with negligence claims in general, liability based on the alleged negligence of a medical professional requires proof of (1) a duty running from the defendant to the plaintiff, (2) the defendant's breach of that duty, (3) damages sustained by the plaintiff, and (4) proximate causation of the damages by the defendant's breach of duty," citing *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assocs. Inc.*, 108 Ohio St.3d 494, 2006-Ohio-942 (further citation omitted); *see also, e.g., Yurkowski v. Univ. of Cincinnati*, 10th Dist. No. 16AP-718, 2017-Ohio-7681, ¶ 35 (medical malpractice plaintiff must show breach of relevant standard of care and "a direct causal connection between the medically negligent act and the injury sustained"). So showing that the Havenars could not establish that element of direct cause (even with facts construed in the light most favorable to them) would indeed entitle Dr. Melaragno to judgment as a matter of law.

{¶ 18} We agree with the trial court that the burden on summary judgment shifted to the Havenars when Dr. Melaragno filed his motion arguing there was no evidence to show probable cause. And we also agree with the trial court that the Havenars did not satisfy their resulting burden by pointing to Ms. Havenar's affidavit (which did not provide the requisite expert testimony that Dr. Melaragno's alleged negligence caused her cancer to spread to other parts of her body).

{¶ 19} We also agree with the trial court that the Havenars did not satisfy their burden by invoking Dr. Weiner's Affidavit of Merit. Civil Rule 10 establishes that when filing a medical malpractice case, or within the time of any extension granted pursuant to that rule, a plaintiff must submit one or more expert affidavits of merit attesting, among other things, that "the standard of care was breached * * * and that the breach caused injury to the plaintiff." Civ.R. 10(D)(2)(a)(iii). The rule is explicit that: "An affidavit of merit is required to establish the adequacy of the complaint and shall not otherwise be admissible as evidence or used for purposes of impeachment." Civ.R. 10(D)(2)(d).

{¶ 20} We read the phrase "not otherwise" in that prohibition to exclude circumstances other than use in "establish[ing] the adequacy of the complaint." *See* Dictionary.com (giving the first definition of "otherwise" as "under other circumstances"). Our reading is consistent not only with common usage, but with the guidance provided by the lead opinion in *Barnard v. Turner, M.D.*, 10th Dist. No. 17AP-550 (May 17, 2018) (Memorandum Decision at ¶ 14): "[A] Civ.R. 10(D)(2) affidavit of merit cannot be considered [on summary judgment] because it is not admissible evidence under the express terms of the rule." *See also id.* (citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 631 (1992) fn. 4 ["Only facts which would be admissible in evidence can be * * * relied upon by the trial court when ruling upon a motion for summary judgment"] and collecting other cases reciting that rule prohibits use of an affidavit of merit as evidence in opposition to summary judgment). The opinion in *Barnard* did note that in dicta, the Ninth District Court of Appeals in *White v. Summa Heath Sys.*, 9th Dist. No. 24283, 2008-Ohio-6790, had "left open the possibility that an affidavit of merit could be considered in opposing a motion for summary judgment if it contained facts that went beyond the bare assertions required by Civ.R. 10(D)(2)(a)," but—while finding that such a hypothetical circumstance did not exist there, as it did not in *White* but as it would here—stated bluntly that, "we cannot reconcile this part of the *White* decision with the express provision in Civ.R. 10(D)(2)(d)." *Barnard* at ¶ 15. Nor can we now. Under the plain text of the rule, the trial court properly excluded consideration of Dr. Weiner's Affidavit of Merit for summary judgment purposes. (And while the Havenars were free to use other testimony of Dr. Weiner, *compare Barnard* at fn. 1, their opposition to summary judgment pointed to statements from his affidavit that he did not repeat during his deposition.)

{¶ 21} But on full review of the record, we conclude that the testimony identified by the Havenars from Dr. Mayerson (alone and coupled with Ms. Havenar's own deposition testimony that Dr. Melaragno had conceded to her in 2017 that the tumor was "bigger than last year," *see* Decision and Entry at 2; Linda Havenar deposition at 82), was sufficient to create a genuine issue of material fact as to whether Dr. Melaragno's alleged fault (not contested here) proximately caused the claimed harms to Linda Havenar.

{¶ 22} As he did in the trial court, Dr. Melaragno hinges his summary judgment case here on the proposition that "the treatment choices available to Ms. Havenar did not change between 2016 and 2017, [so] any delay in diagnosis of the sarcoma was not the proximate cause of any damages claimed by the Plaintiff." Appellees' Brief at 4. We note that throughout the summary judgment process, and at least with regard to the issue of whether his alleged negligence affected the chances of saving Ms. Havenar's leg, Dr. Melaragno has focused exclusively on this proximate cause issue and not on issues involving breach of the standard of care or whether the damages complained of are calculable or compensable under a loss of chance approach or otherwise. *Compare, e.g., McMullen v. Ohio State Univ. Hosps.*, 88 Ohio St.3d 332 (2000) (plaintiff entitled to choice between theory that negligent act directly caused harm, or theory that negligence reduced the likelihood of a more favorable outcome); *Fishpaw v. Francisco*, 10th Dist. No. 05AP-861, 2006-Ohio-3450, ¶ 31 (referencing loss of chance theory and "the increased risk of harm inherent to 'failure to diagnose' cases").

{¶ 23} Dr. Melaragno heralds the trial court's conclusion that " '[a] review of the record * * * has not revealed any evidence that indicates that as a result of Melaragno's failure to diagnose the lesion in 2016, Linda's chance of success with an internal hemipelvectonmy [sic] was worse in 2017 than at the time of Melaragno's alleged failure to diagnose and monitor it in 2016.' " Appellees' Brief at 6, quoting Decision and Entry at 6-7. And he maintains that the trial court's finding is borne out by Dr. Mayerson's testimony, including his statements that "I can't tell you an exact date when [the limb-saving, internal hemipelvectomy] would no longer be realistic," and that he would have discussed the amputative, external hemipelvectomy with Ms. Havenar in 2016 had he seen her then and " 'let her decide' " (in the interrogating lawyer's words) between that and the limb-saving

surgery: "Q. Same as you did in 2017 when she was diagnosed? A. Yes." Appellees' Brief at 20, quoting Mayerson Depo. at 54, 64-65.

{¶ 24} But a reasonable finder of fact could conclude that there is a difference between a choice a patient is offered and the calculus that informs that choice. And reviewing Dr. Mayerson's testimony in context, we also conclude that a reasonable finder of fact, giving that testimony a fair construction, could determine that Dr. Mayerson's evidence supports a reasonable inference that the calculus behind the choice in 2016 would have been decidedly different than it was in 2017.

{¶ 25} Dr. Mayerson, who is Director of the sarcoma program at The Ohio State University Wexner Medical Center and who performed Ms. Havenar's surgery, *see* Mayerson Depo. at 7, 13, could be understood to testify, among other things, that:

- Recognizing the need for having "enough of a platform of bone" in the S.I. joint "to handle the weight and the ambulation" of a saved leg, he would have been "comfortable" offering Ms. Havenar the limb-saving internal hemipelvectomy in 2016, *id.* at 64 (responding to two different but sequential questions);

- The ten months after the 2016 image was taken produced a substantial change in the size and location of the lesion: "[t]here was a significant increase in size," and "[i]t had migrated more superiorly towards the SI joint," *id.* at 48-49;

- He did discuss limb-sparing surgery with Ms. Havenar in 2017. "She understood that this would likely need vascularized bone to heal the remaining portion of the SI joint, which would be destabilized. The remaining portion of her ilium would be suboptimal for weightbearing and this would be a high-risk procedure for the need for further either [amputation] or leaving her with flail limb which was nonfunctional and a hindrance to her," *id.* at 18 (the transcript at line 1 here reflects use of the word "external" when context clearly indicates that "internal" was intended at that point);

- Consideration of the decision between an internal and the external hemipelvectomy was "some about the complication difference * * *, some about the remaining bone that would be left that would -- and the remaining function that she would have left from an internal hemipelvectomy, and some about the

magnitude of extra surgery that she would need to try to reconstruct her SI joint, some about how functional and active she wanted to be," *id.* at 54;

- The sufficiency of the SI joint toward which the enlarged lesion had migrated ("as the lesion got larger, it got closer to the SI joint") was "critical" to the decision, *id.* at 63-64; and

- In 2017, he "thought that [Ms. Havenar] * * * probably [was] going to have a better overall functional outcome" with the amputative external rather than the limb-saving internal hemipelvectomy  "because I was concerned that her -- the remaining amount of bone in her pelvis was going to make it difficult for her to ambulate," *id.* at 62.

{¶ 26} Reading Dr. Mayerson's deposition in full context and in the light most favorable to the non-moving Havenars, a finder of fact would be entitled to conclude that this evidence reflects that the calculus for the surgical choice with which Ms. Havenar was presented changed significantly (from "comfortable" to "high risk") against limb-sparing surgery after her lesion went undetected in 2016 and grew and moved toward the critical SI joint.  (And, although our decision does not turn on the issue, a point in that testimony highlighted by the trial court, *see* Decision and Entry at 6—"Q. * * * is it fair to say you don't have an opinion in this case as to when internal became no longer realistic for her?  A.  I can't tell you an exact date when it would no longer be realistic," Mayerson Depo. at 55— might be understood without too much of a stretch to imply that such stage had come before Ms. Havenar made her election as informed by Dr. Mayerson.)

{¶ 27} Our review of the record, then, does not substantiate the trial court's finding that no "evidence * * * indicates that as a result of Melaragno's failure to diagnose the lesion in 2016, Linda's chance of success with an internal hemipelvec[tomy] was worse in 2017 than at the time of Melaragno's alleged failure to diagnose and monitor in 2016." *Compare* Decision and Entry at 6-7; *id.* at 8 (in context of Havenar affidavit, referencing test as whether evidence showed that alleged negligence "proximately caused harm to Linda by lowering her chances for survival or successful treatment"; ultimately finding "no issue of genuine material fact on the element of proximate cause").

{¶ 28} Again, Dr. Melaragno to date and as to this aspect of the claims has submitted only that there is no evidence that his alleged negligence was the proximate cause of claimed

injury, not that the injury alleged (under the trial court's formulation) would be insufficient to support the Havenars' claims. We will not venture into any such unargued, unbriefed issue here: For purposes of the summary judgment issue now before us, it suffices to note that we do not agree with Dr. Melaragno's central premise that on this record, "[n]o fact issues exist concerning proximate cause, as any delay in diagnosis of the sarcoma had no effect on the treatment options available to Ms. Havenar." *Compare* Appellees' Brief at 16 (heading emphasis and capitalizations omitted). Dr. Melaragno urges that "[n]o change occurred between 2016 and 2017 *concerning* [the surgical alternatives]," and that "the record is devoid of evidence that an alteration in the size of the lesion *affected* the options that were available to Ms. Havenar." *Id.* at 24 (emphasis added). But Dr. Mayerson's testimony, read in the light most favorable to the non-moving Havenars, could reasonably be understood to suggest otherwise.

{¶ 29} Further, however, and in any event, the record contains substantial testimony on the bare (asserted) fact that the lesion grew considerably after it was imaged at the behest of Dr. Melaragno in 2016 and before it was identified as problematic ten months later. *See, e.g.,* Mayerson Depo. at 48, 63; Linda Havenar Depo. at 82 (attesting to statement against interest by Dr. Melaragno about growth of lesion). The record contains additional testimony, too, beyond that cited above, that the expansion has medical significance. *See, e.g.,* Mayerson Depo. at 57 ("The smaller the lesion is the less morbidity in taking it out and the better the prognosis"); Weiner Depo. at 80 ("The larger the tumor is, the larger chance of some complications. But the surgical options are the same").

{¶ 30} The Supreme Court of Ohio, in instructing that "the growth and metastasis of cancer are cognizable physical injuries," has told us that "[w]hether the cancer is left undiagnosed to advance to the point of necessitating the removal of * * * a larger lump, the destruction of additional healthy cells and increased number of cancer cells are physical injuries, not mere physical changes." *Loudin,* 2011-Ohio-1817 at ¶ 18 (adding at ¶ 19 that "a plaintiff need only show some slight injury for the question of damages to go to the jury"). In arriving at that conclusion, the Supreme Court cited favorably to out of state cases that it described as standing for the propositions that: "cancer growth and destruction of healthy tissue constitute injury"; "growth of tumor constitutes physical injury"; and "any growth of a cancerous tumor constitutes physical injury." *Id.* at ¶ 18, fn. 2 (citing decisions including

*Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind.2000); *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405 (N.J.1984); and *Cloys v. Turbin*, 608 S.W.2d 697, 701 (Tex.Civ.App.1980) [wherein that court holds "that an increase in [tumor] size, no matter how small, would constitute sufficient actual damages to sustain the element of injury"]).

{¶ 31} In their briefing here, the Havenars cited to the court of appeals decision that *Loudin* affirmed,  *See* Appellants' Brief at 31, Reply Brief at 10 (both citing to *Loudin v. Radiology & Imaging Servs., Inc.*, 185 Ohio App.3d 438, 2009-Ohio-6947, with lengthy quotation emphasized in bold).  Dr. Melaragno responded, reasonably enough perhaps, that the record at this point in this case does not reflect metastasis, but he does not reckon with the Supreme Court's further recitation that the growth of a cancerous lump, with the destruction of additional healthy cells and an increase in cancerous cells, can itself give rise to cognizable injury.  (Indeed, neither sets of parties advised us that the *Loudin* appeals court decision had been affirmed by the Supreme Court.  And Dr. Melaragno's counsel did not appear at the oral argument to help us assess that or any other issue.)  Here, we conclude that on the record as read in the light most favorable to the non-moving Havenars, there is sufficient evidence to create a genuine issue of material fact as to whether the alleged negligence by Dr. Melaragno proximately caused Ms. Havenar's lesion to go undetected as a problem while it grew in cancerous size and necessitated the removal of a larger lump, and that such injury fits comfortably into her complaint.

{¶ 32} For that reason, too, we sustain the Havenars' second assignment of error. Sustaining the second assignment renders the first assignment of error moot.

{¶ 33} We reverse the grant of summary judgment issued by the Franklin County Court of Common Pleas, and we remand this case to that court for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

SADLER and JAMISON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____