[Cite as *M.F. v. Ohio State Univ. College of Medicine*, 2025-Ohio-4814.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [M.F.] et al., | : | |
| Plaintiffs-Appellants, | : | |
| | : | No. 24AP-84 |
| v. | : | (Ct. of Cl. No. 2018-00002JD) |
| The Ohio State University College of Medicine et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on October 21, 2025

**On brief:** *The Becker Law Firm, Michael F. Becker*, and *David W. Skall*; *Flowers & Grube, Paul W. Flowers*, and *Kendra N. Davitt*, for appellant. **Argued:** *Paul W. Flowers.*

**On brief:** *Dave Yost*, Attorney General, and *Brian M. Kneafsey, Jr.*; *Arnold, Todaro, Welch, & Foliano Co., L.P.A., Gerald J. Todaro, Gregory B. Foliano*, and *Christopher T. Junga*, for appellees. **Argued:** *Christopher T. Junga.*

APPEAL from the Court of Claims of Ohio

BEATTY BLUNT, J.

{¶ 1}  Plaintiff-appellant, M.F., individually and as the parent and guardian of C.F., a minor, appeals a judgment of the Court of Claims of Ohio in favor of defendants-appellees, The Ohio State University Medical Center and The Ohio State University College of Medicine (collectively "OSU").  For the following reasons, we reverse that judgment and remand for further proceedings.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  M.F. gave birth to C.F. at 9:11 p.m. on November 5, 2005 at OSU's hospital. Because C.F. was experiencing respiratory difficulties and cardiovascular shock, he was

taken to the neonatal intensive care unit. At approximately 36 hours of life, C.F. began seizing. A CT scan of C.F.'s brain performed on November 7, 2005 showed an acute subdural hemorrhage. OSU transferred C.F. to Columbus Children's Hospital, now Nationwide Children's Hospital ("Children's Hospital"), for further evaluation and treatment. The physicians at Children's Hospital diagnosed C.F. with severe hypoxic-ischemic encephalopathy, a type of brain damage that occurs when a baby's brain does not receive adequate oxygen (hypoxia) and/or blood (ischemia). C.F. was later diagnosed with cerebral palsy.

{¶ 3} On January 2, 2018, M.F. refiled a complaint against OSU, asserting claims for medical negligence, lack of informed consent, and loss of consortium.[1] In her complaint, M.F. alleged that OSU physicians and nurses provided her negligent care during her labor with and delivery of C.F. and, as a result, C.F. suffered a hypoxic-ischemic injury to his brain. Additionally, M.F. stated that OSU physicians failed to inform her of the material risks of potential injury to C.F. if she proceeded with a vaginal birth. According to M.F., those risks materialized and caused C.F. injury. M.F. also alleged that a reasonable person aware of the material risks of injury to C.F. would have opted for a Cesarean section over a vaginal birth.

{¶ 4} The trial court held a bench trial solely on liability issues. To establish that the management of M.F.'s labor fell below the standard of care, M.F. initially focused on the actions and omissions of the OSU physicians and nurses during the first stage of M.F.'s labor.

**A. First Stage of Labor**

{¶ 5} The first stage of labor begins with the onset of contractions and ends when a woman is fully dilated at ten centimeters. The first stage is split into the latent and active phases. The latent phase is characterized by slow cervical dilation, while in the active phase, the cervix dilates more rapidly. The active phase begins when the cervix is dilated three to five centimeters. At that point, the baby's head (or other presenting part) should engage, i.e., reach the inlet of the mother's pelvis.

---

[1] Originally, M.F. filed a medical negligence action against OSU on September 22, 2010. She voluntarily dismissed her action on June 8, 2016.

{¶ 6}   M.F.'s labor was induced with misoprostol administered at 9:27 p.m. on November 4, 2005, and again at 1:45 a.m. on November 5, 2005.  Her membranes ruptured spontaneously at 5:58 a.m.  M.F. then received oxytocin beginning at 8:00 a.m. to assist her naturally occurring contractions.

{¶ 7}   By 8:30 a.m., M.F. was three centimeters dilated.  She reached four centimeters dilation by 10:35 a.m. and five centimeters by 11:36 a.m.  At that point, M.F.'s progress stalled.  She did not become six centimeters dilated until 2:08 p.m.  At 4:00 p.m., she was still only six centimeters dilated.  Moreover, throughout this entire period, C.F.'s station remained at a negative one.

{¶ 8}   "Station" refers to the level of a baby's head (or other presenting part) in the birth canal.  A baby has reached the level of engagement—the inlet of the mother's pelvis—when its presenting part is at zero station.  A negative one station is slightly above the level of engagement.  Consequently, although M.F. was in the active phase due to the extent of her dilation, not only had her rate of dilation tapered, but also C.F.'s head had not yet reached the level of engagement.

{¶ 9}   Before M.F.'s labor began, a physician had ordered the administration of oxytocin during labor to increase the strength and frequency of M.F.'s contractions.  The nurses titrated the doses of oxytocin M.F. received as her labor progressed.  By 1:32 p.m., M.F. was receiving the dosage of oxytocin necessary for her to achieve optimum uterine activity, which consisted of contractions 2 to 3 minutes apart, each lasting 60 to 90 seconds, with a resting tone between 5 and 15 millimeters of mercury.  However, at 3:14 p.m., when it became apparent M.F.'s dilation rate had slowed, the nurses raised M.F.'s oxytocin dosage from 10 milliunits per minute ("mU/min") to 12 mU/min.   By 3:30 p.m., M.F. was experiencing contractions every one- and one-half minutes, which meant the increased dosage of oxytocin had caused excessive uterine activity.[2]  Nevertheless, nurses increased the oxytocin dosage again at 3:45 p.m. to 14 mU/min.

{¶ 10} At 4:00 p.m., Dr. Jessica Bullard, an obstetrician gynecologist in her second year of residency, examined M.F. and made two important determinations regarding C.F.'s

---

[2] Excessive uterine activity exists when contractions are too frequent, too strong, too long, too close together, or the resting pressure in the uterus when it is not contracted is too high. In general, five one-minute contractions in ten minutes is normal uterine activity. Uterine activity that exceeds those parameters is excessive.

condition.  First, she determined that C.F. had "mod[erate] caput."  (Joint Ex. 2 at 64.)
Caput is swelling of the baby's scalp.  Second, Dr. Bullard determined that C.F. was in the
right occiput posterior ("ROP") position.  In the ROP position, the baby's head is down, and
the baby's back faces the mother's right side.

{¶ 11}  Dr. Bullard rotated C.F. into the occiput posterior ("OP") position, or "sunny
side up" position.  In the OP position, the baby's head is down, and the baby's back is against
the mother's back with the baby facing up.  Problematically, a baby in the OP position has
a lifted, not tucked, chin, which angles the baby's head to present a larger diameter to the
mother's pelvis.  The OP position is a malposition of the fetal head and can make vaginal
delivery more difficult.

{¶ 12}  After rotating C.F. into the OP position at 4:00 p.m., Dr. Bullard made a note
in M.F.'s chart that she would re-evaluate M.F. in one hour.  At 5:43 p.m., when Dr. Bullard
next checked on M.F, she had only dilated one centimeter more to seven centimeters.

## B.  Alleged Breach of Standard of Care – Continuation of Vaginal Labor and Delivery Despite Evidence of Relative Cephalopelvic Disproportion

{¶ 13}  According to M.F.'s obstetrical expert witnesses, Dr. Lucy Bayer-Zwirello and
Dr. Fred J. Duboe, during the first stage of M.F.'s labor, it became apparent that M.F. had
developed a pregnancy complication known as relative cephalopelvic disproportion
("CPD").  Dr. Bayer-Zwirello testified that relative CPD is

> a disproportion between the size of the fetal head and the size
> of the pelvis. . . . If the pelvis is in any way contracted or small
> or on the other hand if the baby is either very large for its
> gestational age or it's malpositioned, in other words, it's not
> dropping into the pelvis in the correct position, . . . there's a
> dissonance, an irregularity between the size of the pelvis and
> the size of the head.

(Tr. Vol. 3 at 497.)

{¶ 14}  The signs of relative CPD present in M.F.'s first stage of labor included (1)
C.F.'s malposition, (2) significant caput prior to engagement, (3) C.F. was not engaged
when M.F. reached the active stage of labor, and (4) after M.F. entered the active phase of
labor, her labor became protracted, with her cervix only dilating two centimeters between
approximately 11:00 a.m. and 4:00 p.m. and C.F. failing to descend during that period.

Notably, after C.F.'s delivery, Dr. Bullard diagnosed M.F. with relative CPD in the post-operative report she drafted.

{¶ 15} Dr. Duboe explained that for a mother with relative CPD, vaginal delivery is like "trying to push a square peg out of round hole [because the mother] can meet with a lot of resistance based on the size of the head relative to the pelvis." (Feb. 14, 2020 Duboe Dep. at 28.) Consequently, the primary danger of vaginal delivery in a setting of relative CPD is trauma to the baby's skull and brain.

{¶ 16} Given this risk, Dr. Bayer-Zwirello opined that the standard of care required the OSU physicians to perform a Cesarean section when M.F.'s dilation arrested at five to six centimeters. Dr. Bayer-Zwirello stated that Dr. Bullard should have consulted with the attending physician, Dr. Jonathan Schaffir, by 4:00 p.m. about the potential need for a Cesarean section. When M.F.'s labor did not speedily accelerate, Dr. Schaffir should have recommended a Cesarean section to M.F. by 5:00 p.m., at the latest. Dr. Duboe gave M.F.'s physicians slightly longer to inform M.F. of the need for a Cesarean section. He opined that the standard of care required the OSU physicians to "call[] [for] it at 6:00 p.m. and perform[] it at 6:30 [p.m]." *Id.* at 56.

### C. Alleged Breach of Standard of Care – Excessive Administration of Pitocin

{¶ 17} According to M.F.'s nursing expert, Michelle Murray, the OSU nurses also violated the standard of care during M.F.'s first stage of labor. Murray opined that M.F.'s nurses breached the standard of care when they did not discontinue the administration of oxytocin at 3:30 p.m., when the increased dosage of oxytocin caused excessive uterine activity in M.F. Rather than terminate the administration of oxytocin, the nurses increased the dosage even higher at 3:45 p.m., leading to continued excessive uterine activity.

### D. Second Stage of Labor

{¶ 18} Despite the complications that arose during M.F.'s first stage of labor, the OSU physicians allowed M.F. to continue laboring. At this point, the record contains conflicting evidence regarding the timing of events. According to the labor and delivery summary contained in M.F.'s medical chart, M.F.'s cervix dilated to ten centimeters at 6:25 p.m. However, according to the progress note written by Dr. Bullard, the right rim of M.F.'s cervix was still present in front of C.F.'s head at 7:00 p.m. Consequently, M.F. was not dilated to ten centimeters at 6:25 p.m. because, 35 minutes later, she was still only

dilated "anywhere from nine and a half to 9.9 centimeters [because] there was a little bit of cervix over on the right side." (Tr. Vol. 8 at 1876.)

{¶ 19} When a mother becomes fully dilated, the second stage of labor—where the baby descends through the birth canal—begins. According to the vitals flowsheet in M.F.'s medical records, M.F. began pushing at 6:30 p.m. At trial, Dr. Bullard concluded that the right rim of M.F.'s cervix "must have been floppy enough" to permit pushing because the 7:00 p.m. progress note states that M.F. was able to push the baby past the rim.[3] *Id.* M.F. continued to push for about one hour with "minimal progress." (Joint Ex. 2 at 64.)

{¶ 20} M.F. contends that she was not even nine centimeters dilated when she began pushing. According to Patricia Hayes, C.F.'s father's stepmother, a nurse instigated M.F.'s first round of pushing. After M.F. had exhausted herself with pushing, an OSU staff member came into M.F.'s hospital room and said, "[S]he's only at eight [centimeters], why . . . are you pushing?" (Tr. Vol. 5 at 1111.)

{¶ 21} After M.F. stopped pushing, C.F.'s head had reached a positive one station—slightly below the inlet of M.F.'s pelvis. M.F.'s epidural was turned off at 7:40 p.m. so she could push more effectively. M.F. then continued to push for approximately another hour.

{¶ 22} From the time M.F. started to push, M.F. was receiving an oxytocin dosage of 16 mU/min, which M.F.'s nursing expert, Murray, characterized as "a very high, excessive dose under the circumstances." (Tr. Vol. 1 at 162.) Murray testified that because M.F. continued to exhibit excessive uterine activity, administering this amount of oxytocin violated the standard of care.

{¶ 23} At 8:43 p.m., Dr. Bullard requested that the attending physician, Dr. Schaffir, assess M.F. Dr. Schaffir determined that C.F.'s head was at a positive two station, or at M.F.'s low pelvis. After reading the fetal heart rate monitoring strip, Dr. Schaffir decided that C.F.'s heart rate was no longer reassuring, and C.F. was becoming hypoxic. Dr. Schaffir opted to expedite C.F.'s delivery by using forceps.

{¶ 24} According to M.F., "[t]hey used the forceps three times to get [C.F.] to come out" because the forceps slipped "more than once." (Tr. Vol. 2 at 460.) M.F.'s medical records, however, reflect that "minimal traction was applied" to C.F.'s head during a

---

[3] Dr. Bullard could not recall M.F.'s labor and, consequently, she could only testify at trial based on her review of M.F.'s medical record and her normal practice.

contraction as M.F. pushed.  (Joint Ex. 2 at 66.)  The forceps were then removed and M.F. delivered C.F. herself.

### E.  Birth, Seizures, and Diagnosis of C.F. with Brain Injury

{¶ 25} One minute after birth, C.F. was assigned an Apgar score of six.[4]  C.F. required bulb suction to remove fluid from his mouth and nose, tactile stimulation, supplemental oxygen, and continuous positive airway pressure ("CPAP").  After five minutes, C.F.'s Apgar score rose to seven.

{¶ 26} When C.F. was born, he "ha[d] a lot of trauma, a lot to his head."  (Tr. Vol. 2 at 356.)  That trauma included "bleeding in the scalp, bruising, swelling of the eyelids, bruising of the face, just over the lips, around the sides of the head."  *Id.*  C.F. also had caput, "significant" molding (an abnormal head shape caused when pressure on the baby's head during childbirth shifts the bony plates in the baby's skull), and a "large" cephalohematoma (an accumulation of blood underneath the baby's scalp).  (Joint Ex. 3 at 7, 26.)

{¶ 27} However, C.F.'s interior injuries were significantly more serious.  All the expert witnesses agreed that C.F. suffered a hypoxic-ischemic brain injury.  The evidence of C.F.'s injury is evident in CT scans performed when C.F. was 2 days (38 hours) old, 3 days (68 hours) old, 17 days old, and 1 month old.  When the brain suffers a hypoxic-ischemic injury, it first swells.  Then the damaged brain cells die and are replaced with cysts, or empty spaces filled with water.  The water eventually drains away, leaving the empty spaces.  The brain then becomes smaller because of the loss of brain tissue, leading to acquired microcephaly, a condition in which a child's head size is comparatively normal when the child is born but becomes smaller as the child ages.

{¶ 28} Two neuroradiologists testified in this case: Dr. Jill Hunter for M.F., and Dr. Gordon Sze for OSU.  Both neuroradiologists identified the above pattern of events in C.F.'s CT scans.[5]  The parties, however, vehemently disputed at trial how and when C.F. suffered the hypoxic-ischemic injury.

---

[4] An Apgar score is a shorthand measurement of a newborn's health. It is based on five criteria: heart rate, respiration, tone, reflex irritability, and appearance. A perfect score is ten.

[5] Both neuroradiologists also identified a subdural hemorrhage on C.F.'s earliest CT scans. Additionally, Dr. Hunter spotted a skull fracture.

**F. Evidence that Breach of the Standard of Care Proximately Caused C.F.'s Brain Damage**

**1. Dr. Frank**

{¶ 29} Dr. Yitzchak Frank, a pediatric neurologist, opined that C.F.'s brain damage was caused by the mechanical forces and/or physical trauma impacting C.F.'s skull during labor and delivery. Dr. Frank explained that, during labor, as the intrauterine pressure on a baby's skull increases, the baby raises the pressure inside of its skull, called intracranial pressure. If a baby's intracranial pressure becomes too high, that pressure compresses the baby's blood vessels and brain tissues, preventing the baby's brain from obtaining enough blood and, thus, oxygen. The intracranial pressure also compresses the baby's veins, preventing the drainage of blood from the brain, which compounds the pressure inside the baby's skull.

{¶ 30} Dr. Frank summarized that excessive physical forces during labor results in increased fetal intracranial pressure, which interferes with blood flow in the baby's brain, thus causing ischemic injury to the baby. Dr. Frank opined that this is the process by which C.F. suffered brain damage. Dr. Frank also opined that C.F. most likely suffered ischemic injury toward the end of the labor and delivery.

**2. Dr. Hermansen**

{¶ 31} Dr. Marcus Hermansen, a pediatrician and neonatologist, agreed with Dr. Frank as the cause and timing of C.F.'s brain damage. Dr. Hermansen testified:

> [C.F.] had trauma to his head that led to decreased blood flow to the brain. The blood wasn't flowing, it probably wasn't flowing into the head very well and wasn't flowing out of the head very well. So[,] his brain didn't get good blood flow and suffered brain damage as a result of that. A word for decreased blood flow . . . is ischemia. If some[one] has ischemia, it means [he is] just not getting enough blood. And this baby had ischemic changes in the brain due to trauma.

(Tr. Vol. 2 at 357.) According to Dr. Hermansen, the physical trauma to C.F.'s head during the labor and delivery caused C.F.'s brain damage. Additionally, Dr. Hermansen testified that the number of nucleated red blood cells in C.F.'s blood one hour after his birth was consistent with an ischemic injury occurring one hour prior to his birth, around 8:00 p.m.

### 3. Dr. Schifrin

{¶ 32} Like Drs. Frank and Hermansen, Dr. Barry Schifrin, an obstetrician gynecologist specializing in maternal-fetal medicine, also opined that head compression during labor caused C.F. ischemic injury. Dr. Schifrin explained that in the second stage of labor, the pressures of the birth canal exert increased pressure on a baby's skull. The baby "protects itself against the pressure on the outside by raising the pressure on the inside, limiting the amount of deformity . . . and pressure in the skull." (Tr. Vol. 3 at 639.) Dr. Schifrin continued:

> The problem about this response for the baby is that the higher the pressure in the baby's head, the greater is the potential of impairment of blood flow into the brain. So what the baby does is it raises its blood pressure to accommodate for the increased pressure in the head. And even during a contraction with pushing in the second stage of labor, the baby attempts and usually successfully maintains blood flow by having . . . a robust series of responses to the pressure exerted on the head . . .

*Id.* at 639-640. However, if the baby's compensatory responses to the increased intracranial pressure are insufficient, then the baby becomes vulnerable to ischemia, i.e., decreased blood flow to the head. If ischemia "prevails over a long enough period of time, . . . the fetal brain can become injured." *Id.* at 641.

{¶ 33} Dr. Schifrin testified that:

> The mechanism of [C.F.'s] injury is essentially the mechanical forces acting on the fetal head [] includ[ing] both . . . excessive uterine activity and superimposed on that the extraordinary pressures related to the mother's pushing. So I believe that those are the factors that directly result. Perhaps less direct but nevertheless important is the duration of the labor, the malposition of the fetal head which increases the time the baby is exposed to these forces and by increasing the pressure in and of itself, that is the . . . fact that the baby's head is occiput posterior makes the labor both longer and more difficult, requiring greater effort for the head to be pushed through the birth canal.

*Id.* at 659.

{¶ 34} Based on the extent of the caput, molding, as well as the distortion of C.F.'s head at birth, Dr. Schifrin opined that the bony part of C.F.'s head never reached the positive two station, as Dr. Schaffir had determined occurred at approximately 8:45 p.m.

(approximately 25 minutes prior to C.F.'s birth). Dr. Schifrin testified that, at best, C.F. was "minimally engaged as a zero, perhaps zero station." *Id.* at 680. M.F.'s pushing thus served to "increas[e] the pressure within [C.F.'s] head, increasing the potential of impaired cerebral blood flow and . . . overtaxing the baby's compensatory responses." *Id.* at 681.

{¶ 35} Dr. Schifrin also assessed the fetal heart rate monitoring strips to determine when cranial compression caused C.F.'s brain damage. Initially, the strips showed a baby with a normal heart rate, with a baseline of 140 to 150 beats per minute ("bpm"). Additionally, during early labor, C.F. maintained reassuring heart rate patterns. Although C.F. was subjected to excessive uterine activity, he retained a stable heart rate.

{¶ 36} At 3:50 p.m., C.F.'s baseline heart rate jumped to 160 bpm and the monitoring strip began showing decelerations, or temporary drops of C.F.'s heart rate, occurring at the same time as contractions. Dr. Schifrin explained that these early decelerations are consistent with fetal head compression.

{¶ 37} When M.F. started pushing at 6:30 p.m., decelerations on the fetal monitoring strip became more obvious and frequent. As M.F. continued to push, C.F.'s baseline heart rate began to creep higher, the decelerations' amplitude increased, and C.F. started to show an inability to maintain a settled baseline between contractions. At approximately 7:40 p.m., C.F.'s heart rate and heart rate pattern shifted: C.F.'s baseline heart rate rose over 160 bpm, variability in C.F.'s heart rate diminished, and the decelerations became less prominent. By 8:20 p.m., C.F.'s baseline heart rate was 170 bpm and C.F.'s heart rate was "very flat" in the absence of contractions. (Tr. Vol. 3 at 675.)

{¶ 38} Dr. Schifrin identified the pattern shown on C.F.'s fetal heart monitoring strip starting at approximately 7:40 p.m. as the conversion pattern, which reflects ischemic injury to the part of the brain containing the vagal system. The vagus nerve controls the parasympathetic system, which slows the heart rate. Paralysis of the vagus nerve produces a higher heart rate, diminished variability, fewer decelerations, and some oscillations in the heart rate. A fetus with a paralyzed vagus nerve produces fetal heart tracings identical to the conversion pattern. Given the conversion pattern present in C.F.'s fetal heart rate tracings, Dr. Schifrin opined that C.F.'s "downward spiral" began between 7:40 p.m. and 8:00 p.m., and C.F. crossed the threshold of ischemic injury at 8:00 p.m. *Id.* at 675.

### 4. Dr. Bayer-Zwirello

{¶ 39} In addition to testifying regarding standard of care, Dr. Bayer-Zwirello also opined regarding causation. Dr. Bayer-Zwirello stated that the OSU physicians' failure to perform a Cesarean section on M.F. by 5:00 p.m.

> led to . . . a forceful labor first and then a forceful delivery with the forceps after pushing for several hours and basically the equivalent of . . . the head being battered for at least during the second stage, which is the pushing stage, but also a little bit before that where the baby's head was kind of pushing against the cervix but ineffectively and it took a long time. And it's that length of time of the continuous contractions and the head compressing, being compressed between the cervix and the . . . bones coming down into the pelvis. In direct OP, [the baby's skull is] a little more fragile, and that caused trauma to the baby's brain.

*Id.* at 548-549. Consequently, Dr. Bayer-Zwirello opined, C.F.'s brain injury was caused by "the length of labor and the squeezing through, forcefully through this smaller pelvis." *Id.* at 551. Dr. Bayer-Zwirello explained that C.F. sustained brain damage through "repetitive hits to [the] brain" from M.F.'s pushing and, subsequently, the use of the forceps. *Id.* at 553.

### 5. Dr. Hunter

{¶ 40} M.F.'s last expert witness, Dr. Jill Hunter, a pediatric neuroradiologist, testified regarding her assessment of C.F.'s medical imaging. Dr. Hunter opined that based on the medical imaging, as well as M.F.'s and C.F.'s clinical information, C.F. suffered a hypoxic-ischemic injury during the labor and delivery.

### 6. Testimony that the OSU Nurses' Breach of the Standard of Care Resulted in the Labor and Delivery that Caused C.F.'s Brain Damage

{¶ 41} Finally, Drs. Schifrin and Duboe connected the OSU nurses' breach of the standard of care to C.F.'s injury. Dr. Schifrin testified that, if the nurses had stopped administering oxytocin at approximately 4:00 p.m., M.F. would not have dilated to ten centimeters. Dr. Schifrin opined that M.F. only reached full dilation due to the excess uterine activity caused by the oxytocin. If the nurses had turned off the oxytocin around 4:00 p.m., M.F. would have had to deliver C.F. by Cesarean section.

{¶ 42} Dr. Duboe concurred with this opinion, stating:

If the Pitocin had been turned down based on all sequences in this protracted labor, more likely than not, this labor would have never proceeded to complete dilation and resulted in the pushing efforts that were required, again, in a prolonged second stage to push this baby out occiput posterior. That would never happen.

(Feb. 14, 2020 Duboe Dep. at 67.)[6]

### G. Testimony that the OSU Physicians and Nurses Met the Standard of Care

{¶ 43} In response to M.F.'s evidence, OSU maintained that (1) its physicians and nurses met the standard of care, and (2) C.F. did not sustain brain damage during the labor and delivery.

{¶ 44} OSU's expert witnesses did not contest that M.F. had relative CPD during her labor.[7] Instead, they maintained that Dr. Bullard acted within the standard of care in responding to M.F.'s relative CPD. First, Dr. John Elliott, an obstetrician gynecologist specializing in maternal-fetal medicine, testified that C.F.'s ROP position caused the relative CPD. According to Dr. Elliott, although the baby's malposition caused a protraction of labor, the standard of care did not require a Cesarean section around 5:30 p.m. because the fetal heart monitor showed the baby was tolerating labor. Dr. Elliott contended that Dr. Bullard's adjustment of C.F.'s position from ROP to OP "obviously corrected the relative CPD that was slowing labor." (Tr. Vol. 4 at 781.)

{¶ 45} Second, Dr. Michael Belfort, an obstetrician gynecologist specializing in maternal-fetal medicine, also agreed that relative CPD complicated M.F.'s pregnancy. Dr. Belfort recognized that relative CPD occurs in situations where

a diameter is presenting that is too big for the pelvis, and then you adjust the baby's head or you have the contractions change the attitude . . . , the flexion of the baby's head and reduce the diameter or you have the baby's head squeezed into a smaller diameter, and that's what nature designed the baby's head to do. . . . [T]he head will simply elongate because the bones are not fused. And then the diameters come down, the baby now fits through and it's delivered.

---

[6] Pitocin is the brand name for the synthetic form of the hormone oxytocin. The witnesses used "Pitocin" and "oxytocin" interchangeably when testifying.

[7] Dr. Schaffir declined to opine on whether relative CPD was present during M.F.'s labor because he did not acknowledge the existence of that diagnosis.

(Tr. Vol. 7 at 1517.)   According to Dr. Belfort, "relative CPD is not an indication for a [C]esarean section unless every option that you've tried has failed." *Id.*

{¶ 46} OSU's expert witnesses also maintained that the OSU nurses met the standard of care in administering oxytocin to M.F.  Dr. Elliott stated:

> [T]he response of the baby is absolutely critical to your management of the amount of Pitocin being given. If the baby is not showing any signs of hypoxemia, meaning lack of oxygen, then the nurse can use her discretion to administer the oxytocin in order to effect cervical change. So the response of the baby is critical. If the baby is showing late decelerations or evidence of hypoxia, then the nurse would turn down or turn off the Pitocin. But that was not the case here.

(Tr. Vol. 4 at 778.)  Dr. Elliott maintained that, throughout M.F.'s labor, C.F.'s fetal heart tracings gave the nurses no reason to suspect he was not tolerating labor and, consequently, to adjust the oxytocin level downward.

{¶ 47} Dr. Belfort testified consistent with Dr. Elliott, opining that the nurses' administration of oxytocin was within the standard of care.  Dr. Belfort stated, "[C]ertainly in 2005, there were no guidelines that said you should turn off or turn down the oxytocin unless . . . the baby was being compromised."[8]  (Tr. Vol. 7 at 1512.)  Dr. Belfort added that the OSU nurses' increase of the oxytocin dosage in response to the slow progression of M.F.'s labor was also within the standard of care.

### H.  Testimony that the Actions and/or Omissions of the OSU Physicians and Nurses Did Not Proximately Cause C.F.'s Brain Damage

{¶ 48} When testifying regarding proximate cause, OSU's expert witnesses agreed with M.F.'s expert witnesses that C.F. suffered a hypoxic-ischemic injury.  None of OSU's expert witnesses could identify with reasonable certainty the exact cause of C.F.'s hypoxic-ischemic injury.  They all, however, agreed that the hypoxic-ischemic injury did not occur during labor and delivery.  Additionally, they all criticized M.F.'s experts' opinions that head compression during labor and delivery resulted in C.F.'s brain damage.

---

[8] Dr. Bullard, as well as former OSU labor and delivery nurses Eileen Sanders and Kyriakoyla Varlas-Fisher, similarly testified that in 2005, the standard of care only required the decrease of oxytocin if the fetal heart rate indicated that the baby was not tolerating labor.

**1. Dr. Dlugos**

{¶ 49} Dr. Dennis Dlugos, a child neurologist, testified that he reviewed C.F.'s early CT scans. Dr. Dlugos opined that C.F.'s CT scans evidenced a pattern consistent with prolonged partial asphyxia, a sustained impairment of the flow of blood and oxygen to the brain. According to Dr. Dlugos, C.F.'s November 7, 2005 CT scan showed an injury that occurred three days before, on November 4, 2005—before the induction of M.F.'s labor.

{¶ 50} Dr. Dlugos explained that prolonged partial asphyxia causes metabolic acidosis in a fetus because the fetus switches to anaerobic metabolism, which produces lactic acid. If metabolic acidosis occurs during labor and delivery, the umbilical cord blood, which is tested immediately after birth, will have a low pH level. C.F.'s cord blood pH level was 7.25, which was within the normal range. Dr. Dlugos opined that C.F.'s partial prolonged asphyxia could not have occurred during labor or delivery because the cord blood was not acidic. Furthermore, Dr. Dlugos stated that the impairment of blood and oxygen C.F. experienced on November 4, 2005 must have reversed itself on the same day, giving C.F. time to restabilize his acid-base levels before his birth on November 5, 2005.

{¶ 51} Additionally, Dr. Dlugos explained that C.F.'s Apgar scores of six and seven were "not compatible with a child who just underwent a hypoxic-ischemic insult." (Tr. Vol. 6 at 1277.) Moreover, if C.F. had just experienced such an insult, he "would be much, much sicker" during his first 24 hours of life. *Id.* at 1283.

{¶ 52} Although Dr. Dlugos could opine as to the timing of C.F.'s hypoxic-ischemic injury, he could not identify the cause of C.F.'s injury. He testified, however, that inability to pinpoint the cause of such an injury is common.

**2. Dr. Elliott**

{¶ 53} Dr. Elliott testified that the hypoxic-ischemic injury to C.F. happened prior to M.F.'s labor, and not during labor and delivery. Dr. Elliott found that

> there's no time in the entire [fetal heart rate monitoring] strip where the baby appears to be oxygen deprived to a point that there could be any injury. There was no acidosis present on the strip. And acidosis needs to be present in order to have a hypoxic-ischemic acidotic injury. The cord-gas and the . . . Apgar scores confirm that there was no pathologic acidosis present in this baby.

(Tr. Vol. 4 at 795-796.)

### 3. Dr. Martin

{¶ 54} Dr. Richard J. Martin, a pediatrician neonatologist, testified that it was "inconceivable" that head compression injured C.F. (Tr. Vol. 5 at 1025.) He stated:

> [I]f a baby had an acute, profound decrease in blood flow to his brain, he would not come out with Apgars of six and seven which are close to normal. Such a baby would have respiratory depression, wouldn't be breathing and would need a tube and to be resuscitated. Such a baby would have cardiac compromise because cardio respiration is controlled from the brain. There would be profound cardiac depression. This baby would probably need CPR, would certainly not have normal heart rate kind of Apgars. I suspect also in all probability such a baby's not going to have normal cord gases.

Id. at 1025-1026. Although Dr. Martin could not specifically define the cause of C.F.'s brain damage, he attributed it generally to "a vascular accident meaning an impairment of blood supply," which was "probably some sort of a problem with the cord or a placental issue." Id. at 1081. Based on C.F.'s nucleated red blood cell count one hour after birth, Dr. Martin opined that this vascular accident occurred greater than 12 hours prior to birth.

### 4. Dr. Belfort

{¶ 55} Dr. Belfort, like Dr. Schifrin, analyzed the fetal heart rate monitoring strips. Dr. Belfort explained that metabolic acidosis affects the brainstem, which controls the fetal heart rate. Consequently, if the fetal heart tracing follows a defined pattern called a "Category III tracing," then the fetus could have experienced metabolic acidosis.

{¶ 56} Reviewing the monitoring strip from 6:00 p.m., Dr. Belfort opined that M.F.'s labor was dysfunctional because her contractions were too frequent. However, C.F.'s fetal heart rate did not indicate he was suffering from metabolic acidosis, so it was "fine to continue this labor." (Tr. Vol. 7 at 1531.) At 6:20 p.m., M.F.'s labor became more regular. Around 7:35 p.m., C.F.'s baseline heart rate rose but remained within normal limits. Also around that time, C.F.'s heart rate showed occasional variable decelerations in response to M.F.'s contractions, which Dr. Belfort attributed to head or cord compression. Because minimal variability remained present in C.F.'s fetal heart tracings, Dr. Belfort stated that the compression did not cause metabolic acidosis. At approximately 8:20 p.m., C.F. began

exhibiting tachycardia, but Dr. Belfort testified that tachycardia is common in labor.[9]  After evaluating the entire strip from 6:00 p.m. until C.F.'s birth at 9:11 p.m., Dr. Belfort opined that nothing on the strip showed that C.F. had suffered brain damage.

### 5. Dr. Sze

{¶ 57}  Finally, Dr. Sze, who assessed the medical imaging of C.F.'s brain, concluded that C.F.'s brain damage was "due to [a] hypoxic-ischemic injury that most likely occurred on November 4th, prior to labor and delivery."  (Tr. Vol. 6 at 1419.)  Dr. Sze testified that his conclusion correlated with C.F.'s normal Apgar scores and normal cord gas pH level.

### 6. Rejection of M.F.'s Experts' Testimony

{¶ 58}  OSU's expert witnesses uniformly rejected the opinion expressed by M.F.'s expert witnesses that head compression caused C.F. hypoxic-ischemic injury.  Dr. Elliott testified that "it's not biologically plausible. There is no definitive scientific evidence that would support it. It just plain doesn't make sense." (Tr. Vol. 4 at 839.)  Dr. Dlugos stated he was "puzzled about whether that mechanism of injury could happen given the way blood flows to the brain." (Tr. Vol. 6 at 1309.)  Dr. Dlugos explained that the amount of pressure "required to cut off blood flow to the brain would be enormous," and he could not see that "happening without [an] extensive bloody, bloody brain injury that we just don't have in this case." *Id.* at 1311-1312.  According to Dr. Sze, only a small group of physicians had "hypothesized that pressure on the skull can raise the intracranial pressure to an extent that blood cannot enter." *Id.* at 1423.  However, "the vast majority of people think that for this to occur, . . . you would have to have pressure so great that you would create underlying injury to the brain itself." *Id.* at 1424.  Finally, Dr. Belfort contended M.F.'s expert witnesses advanced a "ridiculous theory with absolutely no credible evidence."  (Tr. Vol. 7 at 1501.)  Dr. Belfort opined that "[i]f you are squeezing the head so hard that you're causing cranial compression or whatever, you'd be squeezing the cerebellum out the bottom of the head and seeing intense bradycardia or death. So[,] this is just an insane theory." *Id.* at 1503.

### I. M.F.'s Experts' Response

{¶ 59}  To rebut OSU's expert witnesses' opinions, M.F.'s expert witnesses clarified that C.F.'s cord gas pH level and Apgar scores did not affect their conclusions.  Dr. Frank testified that mechanical trauma could cause brain damage without causing metabolic

---

[9] Tachycardia is a faster than normal heart rate.

acidosis. Dr. Frank explained that mechanical trauma "affects only the brain or different areas of the brain, and it doesn't reflect in the systemic blood circulation, . . . where we check for acidosis. If you checked inside the brain cells, which we cannot, or inside the brain tissue, there will be acidosis. . . . So[,] it's a difference between . . . a focal phenomena [and] a . . . systemic phenomena." (Tr. Vol. 2 at 274.)

{¶ 60} Dr. Hermansen testified that he expected normal acidity levels in C.F.'s cord blood. He expounded:

> The brain isn't changing the pH. That's not what the brain does. The pH will fall with total body asphyxia global to the whole body. Because then primarily the muscles make so much acid, it builds up in the body. That's not what happened in this case. This was all in the head. And whatever acid might have been produced was cleared from the baby, because the . . . baby's heart, placenta and umbilical cord were all functioning, so you would not expect acid to accumulate.

*Id.* at 415-416. In other words, "whatever [acid] enter[ed] the circulation" as a result of the hypoxic-ischemic injury was "cleared from the baby to the placenta in the mom's system and cleared out. As long as that placenta system is working, . . . for the baby, it won't accumulate, you won't change the pH." *Id.* at 416.

{¶ 61} Dr. Schifrin concurred that normal cord gas levels do not rule out brain damage through head compression during labor and delivery. Dr. Schifrin testified:

> [T]he problem is not oxygen availability to the fetus, but blood flow to the fetal brain. So that if I . . . put pressure on the head or if I clamp the blood vessels going to the fetal head . . . [and] blood vessels coming [from] the fetal head, then the flow through the umbilical cord is fine, the placenta is still functioning and the circulation presumably through the rest of the body is adequate. So even though . . . there may be some . . . acid created within the skull, by the time it gets into the circulation, by the time the circulation passes through the placenta, you would not normally be able to see any small amount, a relatively small amount of acid produced by the lack of blood flow to the brain. . . . [T]here is no systemic acidosis that you see. . . . [I]f this is simply related to the compression of the vessels in the head and the impaired perfusion of the head, there is no reason for the baby to have systemic acidosis because his circulation . . . is otherwise fine, and the circulation with the placenta and the replacement of oxygen and the

> removal of acid is taking place, and so that's going to clear any acid that's coming from the head.

(Tr. Vol. 3 at 653-654.)

{¶ 62} With regard to C.F.'s Apgar scores, Dr. Frank concluded that C.F. "had low Apgar scores, not extremely low, but low, which means he did not behave like a . . . typical or normal newborn." (Tr. Vol. 2 at 278.) Additionally, Dr. Hunter explained, "[W]e know, and I think it's well recognized even in the literature that Apgars are very subjective. So[,] they don't correlate one-on-one for instance with the actual damage to the child or the actual clinical status of the child at the time those Apgars are recorded." (Tr. Vol. 5 at 1179.)

### J. Procedural History

{¶ 63} On April 28, 2021, the Court of Claims issued a decision and judgment entry finding in favor of OSU. The Court of Claims' decision addressed one issue—proximate cause. In relevant part, the Court of Claims stated:

> In the Court's view, Dr. Hunter's testimony and Dr. Sze's testimony provide a good example of opposite expert opinions, with both experts offering differing opinions on the size of [C.F.]'s subdural hematoma, the presence of bleeding on [C.F.]'s brain, the time of peak edema, and the date of injury to [C.F]. Additionally, in the Court's view, while Dr. Schifrin's testimony appears to be based on reliable, scientific, medical data, Dr. Schifrin's testimony is not reliable enough to counterbalance reliable opinions of other experts that are opposed to it. And, while some of Plaintiffs' witnesses testified that CPD was the cause of [C.F.]'s injury, the evidence shows that [M.F.]'s cervix was of a normal size. Moreover, it does not appear to the Court that during labor [M.F.] requested a C-section. The Court finds that the submitted evidence leaves this case in equipoise. Under Ohio law, if the weight of the evidence is equally balanced, the party who has the burden of proof has not established such issue by a preponderance of the evidence.
> . . .
>
> Some reasons for medical injuries are best answered by the Almighty or by future medical advances. After considering the evidence submitted, the Court is unable to determine the proximate cause of [C.F.]'s injuries. Plaintiffs thus have failed to sustain claims of medical negligence by a preponderance of the evidence.

(Citations omitted.) (Apr. 28, 2021 Decision at 8-9.)

{¶ 64} M.F. appealed the Court of Claims' judgment to this court. [*M.F.*] *v. Ohio State Univ. Med. Ctr.*, 2022-Ohio-2937 (10th Dist.). Although M.F. asserted three assignments of error, we found her second assignment of error dispositive of her appeal. In that assignment of error, M.F. argued that the Court of Claims violated her due process rights by failing to consider Dr. Duboe's trial deposition testimony. Our review of the Court of Claims' April 28, 2021 decision revealed that the Court of Claims did not refer to Dr. Duboe or his trial deposition testimony, even though it otherwise individually summarized the testimony of every other expert witness. We thus "conclude[d] that the trial court violated [M.F.]'s due process rights by overlooking testimony of this central expert for [M.F.] in determining OSU's liability to [M.F.]." *Id.* at ¶ 9. Consequently, we sustained M.F.'s second assignment of error, reversed the Court of Claims' judgment, and remanded the matter to that court for it to consider Dr. Duboe's trial deposition testimony.[10] We found M.F.'s first and third assignments of error moot.

{¶ 65} On April 12, 2023, the Court of Claims issued a supplemental decision and corresponding judgment entry. In the supplemental decision, the Court of Claims averred that it reviewed Dr. Duboe's deposition testimony, as well as the court's previous findings, conclusions, and judgment on the liability issue. Based on that review, the Court of Claims concluded, once again, that the weight of the evidence was equally balanced on the issue of proximate cause. Therefore, the Court of Claims found M.F. failed to prove by a preponderance of the evidence her claims for medical negligence, lack of informed consent, and loss of consortium.

{¶ 66} Again, M.F. appealed to this court. *M.F. v. Ohio State Univ. Med. Ctr.*, 2023-Ohio-4799 (10th Dist.). M.F. assigned two errors, but the first assignment of error, which challenged the Court of Claims' review of Dr. Duboe's testimony, proved dispositive. We determined that the Court of Claims reviewed Dr. Duboe's *discovery* deposition testimony, rather than his *trial* deposition testimony, as directed in our prior decision. We, therefore, sustained M.F.'s first assignment of error, reversed the Court of Claims' judgment, and

---

[10] OSU now argues in this appeal that Dr. Duboe's trial deposition testimony is not part of the trial record because M.F. never introduced it into evidence during trial. OSU could have—and should have—raised this argument in the first appeal when M.F. initially asserted that the Court of Claims erred in not considering Dr. Duboe's trial deposition testimony. Because OSU did not assert this argument at the first opportunity, OSU is now barred from asserting it. *See Yurkowski v. Univ. of Cincinnati*, 2017-Ohio-7681, ¶ 19 (10th Dist.) (failure to make an argument in a first appeal precludes a party from making the argument in a subsequent appeal following remand).

remanded the matter to the Court of Claims to review Dr. Duboe's trial deposition testimony. We found the second assignment of error moot.

{¶ 67} On December 29, 2023, the Court of Claims issued its third decision and corresponding judgment. After reviewing Dr. Duboe's trial deposition testimony, the Court of Claims found that it did not alter its previous disposition of the claims. The Court of Claims held:

> The Court is unable to determine the proximate cause of [C.F.]'s injuries. Based upon the testimony of all witnesses, as well as Dr. Duboe's videorecorded trial testimony, the Court determines that the weight of the evidence is equally balanced and, consequently, Plaintiffs have failed to prove their claims by a preponderance of the evidence in this matter.

(Dec. 29, 2023 Decision at 1-2.)

## II. ASSIGNMENTS OF ERROR

{¶ 68} M.F. now appeals the Court of Claims' December 29, 2023 judgment, and she assigns the following errors:

> [1.] THE COURT OF CLAIMS' DETERMINATION THAT THE TRIAL TESTIMONY WAS "IN EQUIPOISE" AND FINDINGS IN FAVOR OF THE DEFENSE ON PROXIMATE CAUSE ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [2.] THE COURT OF CLAIMS ERRED IN DETERMINING COMPARATIVE FAULT BY THE PLAINTIFFS.
>
> [3.] THE COURT OF CLAIMS VIOLATED PLAINTIFFS' STATE DUE PROCESS RIGHTS BY PROHIBITING RECOVERY FOR ANY INJURIES.

## III. LEGAL ANALYSIS

{¶ 69} By her first assignment of error, M.F. argues that the Court of Claims' determination that she did not prove proximate cause is against the manifest weight of the evidence. The standard of review for manifest weight of the evidence is the same in both criminal and civil cases. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17. The phrase "manifest weight of the evidence" "relates to persuasion." *Id*. at ¶ 19. It " 'concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Id*. at ¶ 12, quoting *State v.*

*Thompkins*, 1997-Ohio-52, ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). In reviewing a judgment under the manifest-weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* at ¶ 20.

{¶ 70} In weighing the evidence, an appellate court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. This presumption exists because the trier of fact is in the best position to evaluate the evidence by viewing the witnesses and observing their demeanor, voice inflections, and gestures. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Nevertheless, despite the presumption favoring the trier of fact, due to the appellate court's role in manifest-weight cases as the "thirteenth juror," an appellate court may disagree with the trier of fact's resolution of conflicting evidence when applying the manifest-weight standard of review. *State v. Martin*, 2022-Ohio-4175, ¶ 26. "Sitting as the 'thirteenth juror,' [an appellate court] considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *State v. Jordan*, 2023-Ohio-3800, ¶ 17.

### A. Medical Negligence

{¶ 71} To establish a claim for medical negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages. *Cromer v. Children's Hosp. Med. Ctr.*, 2015-Ohio-229, ¶ 23. A physician or nurse owes their patient a duty "to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise under similar circumstances." *Id.* at ¶ 27. If a plaintiff proves a physician or nurse breached this duty, the trier of fact must then determine whether that breach proximately caused injury. *Badawi v. Ohio State Univ. Wexner Med. Ctr.*, 2024-Ohio-2503, ¶ 17 (10th Dist.). Proximate cause means " 'some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered.' " *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 1995-Ohio-285, ¶ 46, quoting Prosser & Keeton, *Law of Torts*, Section 41, 263 (5th Ed. 1984). "The rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such

consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.' " (Further quotation marks deleted and citations omitted.) *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143 (1989), quoting *Ross v. Nutt*, 177 Ohio St. 113, 114 (1964).

{¶ 72} Under the doctrine of respondeat superior, a hospital is liable for the negligence of its employees. *Berdyck v. Shinde*, 1993-Ohio-183, 66 Ohio St.3d 573, 577. Here, OSU does not contest that it employed the physicians and nurses who provided medical care to M.F. at OSU, and those physicians and nurses acted within the course and scope of their employment while providing M.F. medical care. Thus, OSU must be held liable for any negligent acts of its employees.

{¶ 73} The Court of Claims decided M.F.'s medical negligence claim in OSU's favor based solely on its finding that the alleged breaches of the standard of care did not proximately cause C.F.'s injuries. After considering the evidence relative to proximate cause, the Court of Claims determined that the weight of that evidence was equally balanced, leaving the case in equipoise. The Court of Claims, therefore, concluded that M.F. failed to prove by a preponderance of the evidence that OSU proximately caused C.F.'s injuries.

{¶ 74} " ' "[A] preponderance of evidence means the greater weight of evidence. . . . The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." ' " *State v. Nicholas*, 2022-Ohio-4276, ¶ 29, quoting *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987), quoting *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261 (1928). Consequently, if the evidence for and against an issue is of equal weight, leaving the matter in equipoise, then the party with the burden of proving that issue by a preponderance of the evidence fails to meet its burden. *Klunk v. Hocking Valley Ry. Co.*, 74 Ohio St. 125, 136 (1906); *Benton v. Miller*, 1987 Ohio App. LEXIS 8449, *3 (10th Dist. Aug. 20, 1987); *Laughbaum v. Woutat*, 1986 Ohio App. LEXIS 9192, *4 (3d Dist. Nov. 19, 1986); *Smith v. Prudential Ins. Co.*, 1979 Ohio App. LEXIS 10118, *6 (8th Dist. Oct. 25, 1979); *Ottgen v. Garey*, 41 Ohio App. 499 (6th Dist. 1932), paragraph seven of the syllabus. Here, M.F. bore the burden of proving each element of her claim for medical negligence by a preponderance of the evidence. As a result, equilibrium in the weight of the evidence as to proximate cause resulted in judgment in OSU's favor.

{¶ 75} As we explained above, M.F. contended that the OSU physicians and nurses breached the standard of care by (1) not terminating M.F.'s vaginal labor in favor of a Cesarean section by 6:00 p.m., at the latest, and (2) not terminating or reducing the amount of oxytocin M.F. was receiving by 4:00 p.m. M.F. asserted that, had the OSU physicians and nurses followed the standard of care, she would not have entered the second stage of labor, during which mechanical forces—namely, excessive uterine activity and M.F.'s pushing—compressed C.F.'s head against M.F.'s pelvis, causing him to suffer a hypoxic-ischemic injury. In opposing this assertion, OSU maintained that head compression could not have caused C.F.'s hypoxic-ischemic injury and, in any event, C.F.'s brain damage occurred prior to the induction of M.F.'s labor.

{¶ 76} In finding the evidence of this case in equipoise, the Court of Claims determined that both M.F.'s and OSU's expert witnesses generally presented credible testimony. When evaluating proximate cause, the Court of Claims appeared to accord equal weight to the testimony of M.F.'s expert witnesses and the testimony of OSU's expert witnesses. The Court of Claims, however, made two factual findings detrimental to M.F.'s case: (1) "while some of Plaintiffs' witnesses testified that CPD was the cause of [C.F.]'s injury, the evidence shows that [M.F.]'s cervix was of a normal size," and (2) "it does not appear to the Court that during labor [M.F.] requested a C-section." (Apr. 28, 2021 Decision at 9.) Both of these factual findings are problematic.

{¶ 77} The Court of Claims' first finding implies that M.F. did not have CPD because her pelvis[11] was of a normal size and, therefore, CPD could not be the cause of C.F.'s injury. However, this finding oversimplifies the evidence regarding CPD and M.F.'s experts' testimony regarding proximate cause. First, a normal-size pelvis does preclude a diagnosis of relative CPD. Second, M.F.'s expert witnesses did not testify that relative CPD, alone, caused C.F.'s injuries.

{¶ 78} Dr. Bayer-Zwirello testified that CPD is a "disproportion between the size of the fetal head and the size of the [mother's] pelvis," which can be caused by a mother with a relatively small pelvis, a baby with a relatively large head, and/or the malposition of the baby. (Tr. Vol. 3 at 497.) As both sides' expert witnesses explained, there are two types of

---

[11] Although the Court of Claims actually found that the size of M.F.'s cervix was normal, with CPD, it is the size of the *pelvis*, not the *cervix*, that matters.

CPD—absolute or true CPD and relative CPD. Dr. Bullard testified that in a mother with absolute CPD, "the baby's not going to fit. . . . [T]he baby's head, the baby itself is too large to fit through that particular pelvis. . . . [T]here's nothing you can do at all to make this baby come through. It is not going to fit. Period." (Tr. Vol. 8 at 1857.) However, as Dr. Bayer-Zwirello testified, in the case of a mother with relative CPD, "if you push hard enough, you can do it." (Tr. Vol. 3 at 535.)

{¶ 79} All the expert witnesses who testified regarding M.F.'s CPD determined that she had relative CPD. Even OSU's expert witnesses agreed that a woman with a normal size pelvis, like M.F., could have relative CPD due to malposition. Indeed, Dr. Bullard testified that she diagnosed M.F. with relative CDP because "she had a malposition. She was occiput posterior." (Tr. Vol. 8 at 1911.) *See also id.* at 1886 ("I considered it a relative CPD. That's what she had a diagnosis of with her malposition of occiput posterior.").

{¶ 80} Thus, the evidence does not support the Court of Claims' conclusion that M.F. did not have CPD due to her pelvis' normal size. To the contrary, the evidence establishes that M.F. had relative CPD due to C.F.'s malposition.

{¶ 81} M.F.'s experts' opinions regarding the proximate cause of C.F.'s injuries focused on the mechanical forces C.F. was subjected to during labor, particularly during the second stage of labor. Dr. Schifrin explained that those mechanical forces—excessive uterine activity and the pressure from M.F.'s pushing—compressed C.F.'s head, increasing his intracranial pressure and impairing blood flow to his brain. Because the OP position makes labor longer and more difficult, C.F.'s malposition in the birth canal increased both the amount of pressure he was exposed to and the time he was exposed to that pressure. Dr. Bayer-Zwirello also opined that C.F.'s OP position also made his head more vulnerable to injury. Consequently, while malposition contributed to C.F.'s injuries, none of M.F.'s experts opined that malposition—or relative CPD—was "the" cause of C.F.'s brain damage.

{¶ 82} Next, in the context of deciding proximate cause, the Court of Claims found that "it d[id] not appear . . . that during labor [M.F.] requested a C-section." (Apr. 28, 2021 Decision at 9.) To determine proximate cause, the Court of Claims had to consider whether C.F.'s injury was "the natural and probable consequence" of OSU's negligence. *Jeffers*, 43 Ohio St.3d 140 at 143. In this case, M.F. alleged the OSU physicians negligently failed to recommend a Cesarean section by 6:00 p.m., at the latest. The question before the Court

of Claims, therefore, was whether the OSU physicians' failure to recommend a Cesarean section naturally and probably resulted in C.F.'s brain damage. Whether M.F.—a 19-year-old, first-time mother—ever requested a Cesarean section simply has no relevancy to this question. Consequently, the Court of Claims erred by including M.F.'s failure to request a Cesarean section in its assessment of proximate cause.

{¶ 83} In weighing the evidence on proximate cause, the Court of Claims placed the evidence favoring M.F. on one side of a scale and the evidence favoring OSU on the other. The Court of Claims found the scale balanced equally because, by its own assessment, the evidence on each side weighed the same. *See, e.g.*, *Matchmaker Internatl. v. Long*, 100 Ohio App.3d 406, 409 (9th Dist. 1995) (finding evidence in equipoise where "[one party's] evidence was found to be of weight equal to, not greater than, that of [the other party]"). In finding the scale equally balanced, the Court of Claims acknowledged that two factual findings—M.F.'s "*cervix* was of a normal size" and therefore CPD was not present, and M.F. failed to request a Cesarean section—bore on its ultimate conclusion that the evidence was in equipoise. (Emphasis added.) (Apr. 28, 2021 Decision at 9.) However, these two factual findings are erroneous and/or irrelevant to a determination of proximate cause. Given that the Court of Claims acknowledged relying on these factual findings in its proximate cause analysis, once they are removed, the balance of the scale necessarily shifts. In short, without those erroneous and/or irrelevant factual findings integral to the Court of Claims' April 28, 2021 decision, the evidence now weighs in M.F.'s favor on proximate cause. Therefore, we must conclude that judgment in favor of OSU on M.F.'s claim for medical negligence is against the manifest weight of the evidence.

{¶ 84} M.F. asserted a claim for loss of filial consortium as a result of the physical injury OSU allegedly negligently caused C.F. The Court of Claims held that this claim failed because M.F. did not prove medical negligence. Because the Court of Claims erred in granting judgment in OSU's favor on the claim for medical negligence, we conclude that the Court of Claims also erred in granting judgment for OSU on the derivative loss-of-consortium claim. *See Piispanen v. Carter*, 2006-Ohio-2382, ¶ 30 (11th Dist.) (because the principal claims against the defendants survived dismissal, the plaintiffs' claim for loss of consortium also survived dismissal); *Tecco v. Columbiana Cty. Jail*, 2000-Ohio-2634 (7th Dist.) (because the trial court erred in granting summary judgment on the plaintiff's

negligence claim, it also erred in granting summary judgment on the plaintiff's wife's claim for loss of consortium).

### B. Lack of Informed Consent

{¶ 85} Next, we consider M.F.'s claim for lack of informed consent. To prove a claim for lack of informed consent, a plaintiff must show (1) the physician failed to disclose to and discuss with the patient the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any; (2) the unrevealed material risks and dangers which should have been disclosed by the physician actually materialized and proximately caused injury to the patient; and (3) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy. *Nickell v. Gonzales*, 17 Ohio St.3d 136 (1985), syllabus.

{¶ 86} With regard to the tort of lack of informed consent, " 'a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment.' " *White v. Leimbach*, 2011-Ohio-6238, ¶ 31, quoting *Nickell* at 139. Thus, a physician need not disclose every conceivable risk, just those risks material to a reasonable person's informed and intelligent decision-making process. *Id.* at ¶ 33.

{¶ 87} Expert testimony is necessary to establish the material risks that a physician must disclose regarding treatment or a procedure. *Id.* at ¶ 35. However, " 'materiality itself must ultimately be judged by asking what a reasonable patient would want to know.' " *Id.* at ¶ 36, quoting *Marsingill v. O'Malley*, 58 P.3d 495, 504 (Alaska 2002). Therefore, while expert medical testimony must establish the material risks and dangers inherently and potentially involved with a medical procedure, the trier of fact decides whether those risks would have mattered to a reasonable patient. *Id.* at ¶ 36-37. Finally, "expert medical testimony is also required to establish that an undisclosed risk or danger actually materialized and proximately caused injury to the patient." *Id.* at ¶ 38.

{¶ 88} Consistent with its determination of M.F.'s claim for medical negligence, the Court of Claims decided M.F.'s claim for lack of informed consent by solely resolving the proximate-cause element. The Court of Claims engaged in the following analysis:

> [*E*]*ven if* Dr. Bullard failed to disclose to [M.F.] and discuss with [M.F.] the benefits of a C-section or material risks and dangers inherently and potentially involved with respect to a C-section; and, *even if*, unrevealed risks and dangers which should have been disclosed by Dr. Bullard actually materialized; and, *even if* a reasonable person in [M.F.]'s position would have opted for a C-section if the material risks and dangers inherent and incidental to a C-section had been disclosed, such events are insufficient to demonstrate that a lack of a C-section proximately caused injury to [C.F.] . . . Without sufficient expert testimony establishing that an undisclosed risk or danger proximately resulting from a failure to perform a C-section caused [C.F.]'s injury, Plaintiffs are unable to prevail on their claim of a lack of informed consent. As the Court previously noted in its trial decision, . . . the Court is not sure when [C.F.]'s injury occurred, i.e., prepartum or intrapartum. Based on the evidence presented at trial, the Court finds that Plaintiffs have failed to prove their claim of a lack of informed consent by a preponderance of the evidence.

(Emphasis in original.) (Citations omitted.) (Apr. 12, 2023 Decision at 6-7.)

{¶ 89} Initially, the Court of Claims erred in how it characterized M.F.'s claim for lack of informed consent. While the Court of Claims focused on whether M.F. knew of the risks of a *Cesarean section*, M.F. asserted the OSU physicians failed to inform her about the risks of continuing with the *vaginal delivery*. M.F. alleged that the OSU physicians failed to disclose and discuss the material risks and dangers inherently and potentially involved with proceeding with a vaginal delivery when it became apparent that she had relative CPD (around 4:00 p.m.). M.F. claimed that a reasonable person in her position would have decided against a vaginal delivery and in favor of a Cesarean section had she known of the material risks and dangers of continuing with the vaginal delivery.

{¶ 90} Although the Court of Claims initially identified a Cesarean section as the proposed procedure, it properly considered whether the *failure* to perform a Cesarean section proximately caused C.F.'s injury. In doing so, the Court of Claims assumed that brain damage, like that the brain damage C.F. suffered, was an unrevealed material risk of proceeding with the second stage of M.F.'s labor. The Court of Claims then found that, nevertheless, M.F. could not prevail on her claim for lack of informed consent because she did not prove by a preponderance of the evidence that continuing with the vaginal delivery proximately caused C.F.'s brain damage.

{¶ 91} In making the proximate cause determination, the Court of Claims relied on its earlier finding that the weight of the evidence regarding proximate cause was equally balanced. Due to the equilibrium in the evidence, the Court of Claims could not decide whether C.F.'s brain damage was caused by mechanical forces—contractions and pushing—during M.F.'s labor (i.e., intrapartum), as M.F.'s expert witnesses testified, or an unknown event that happened prior to M.F.'s labor (i.e., prepartum), as OSU's expert witnesses testified. The Court of Claims, therefore, determined that M.F. did not meet her burden of proof as to proximate cause.

{¶ 92} However, as we concluded above, the Court of Claims' analysis of proximate cause included considerations not supported by the evidence and irrelevant under the law. Without those considerations, the evidence on proximate cause weighs in M.F.'s favor. Consequently, like the judgment in OSU's favor on the claim for medical negligence, the judgment in OSU's favor on the claim for lack of informed consent is against the manifest weight of the evidence.

{¶ 93} In sum, we conclude that the manifest weight of the evidence does not support the Court of Claims' finding regarding proximate cause. We, therefore, determine that the Court of Claims erred in entering judgment in OSU's favor on M.F.'s claims for medical negligence, loss of consortium, and lack of informed consent. Accordingly, we sustain her first assignment of error.

### C. Remedy on Remand

{¶ 94} Having found the Court of Claims' judgment against the manifest weight of the evidence, we must determine the appropriate remedy. When a court of appeals finds that a civil judgment that results from a bench trial is against the manifest weight of the evidence, the court of appeals may "either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings." App.R. 12(C)(1).

{¶ 95} M.F. maintains that, upon finding the Court of Claims' judgment against the manifest weight of the evidence, this court should enter judgment in her favor. M.F., however, disregards the Court of Claims' failure to decide multiple factual issues relevant to OSU's liability for medical negligence and lack of informed consent. There remains no determination of (1) whether OSU breached the standard of care by not terminating M.F.'s

vaginal labor in favor of a Cesarean section by 6:00 p.m., at the latest, or not terminating or reducing the amount of oxytocin M.F. was receiving by 4:00 p.m.; (2) whether the OSU physicians failed to disclose to and discuss with M.F. the material risks and dangers involved with continuing the vaginal delivery in her circumstances; and (3) whether a reasonable person in M.F.'s position would have decided against vaginal delivery and chosen a Cesarean section given the undisclosed material risks and dangers.

{¶ 96} When acting pursuant to our appellate jurisdiction, we do not make factual findings in the first instance. *In re D.R.*, 2023-Ohio-539, ¶ 37 (10th Dist.), quoting Ohio Const., art. IV, § 3(B)(2) ("[C]ourts of appeals shall have such jurisdiction as may be provided by law to 'review and affirm, modify, or reverse judgments or final orders' of trial courts within their district."). As a reviewing court, it is not our province to act as a factfinder and conduct an initial weighing of the evidence. *In re K.T.*, 2016-Ohio-5812, ¶ 8 (9th Dist.); *State v. Dew*, 2016-Ohio-882, ¶ 22 (7th Dist.). We, consequently, cannot weigh the evidence in this record to decide the outstanding factual issues because we would be the first court to do so. That role belongs to the trial court.

{¶ 97} We, therefore, determine that the appropriate remedy in this case is a remand to the Court of Claims for further proceedings. Given the length of time this case has been pending, the Court of Claims should review the existing trial record, including Dr. Duboe's trial deposition testimony, and decide the remaining factual issues regarding liability. We reached our determinations regarding proximate cause by assuming, like the Court of Claims did, that the facts favored M.F. on all undecided elements. On remand, these assumptions should not influence the Court of Claims' resolution of the facts.

## IV. CONCLUSION

{¶ 98} For the foregoing reasons, we sustain the first assignment of error. Our ruling on the first assignment of error renders moot the second and third assignments of error. We reverse the judgment of the Court of Claims of Ohio, and we remand this cause to that court for further proceedings consistent with law and this decision.

*Judgment reversed;*
*cause remanded.*

JAMISON, P.J., and EDELSTEIN, J., concur.

————————